# 14-2617cv

*In The*

*United States Court of Appeals*

*For the Second Circuit*

---

**JOHN SCHWARZKOPF, JR.**
*Plaintiff-Appellant,*

v.

**SIKORSKY AIRCRAFT CORPORATION**
*Defendant-Appellee.*

---

**ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
(Civil Action No. 3:13-cv-00087 (AVC))**

---

**BRIEF OF PLAINTIFF-APPELLANT
JOHN SCHWARZKOPF, JR.**

---

**Nicole M. Rothgeb
Gregg D. Adler
Livingston, Adler, Pulda, Meiklejohn
   & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
Phone:  (860) 233-9821
Fax: (860) 232-7818
nmrothgeb@lapm.org
gdadler@lapm.org**

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

**PAGE**

**TABLE OF CONTENTS**................................................................i

**TABLE OF AUTHORITIES**...........................................................iii

**PRELIMINARY STATEMENT**.......................................................1

**STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION**..................................................................1

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**.................1

**STATEMENT OF THE CASE**.......................................................2

**STATEMENT OF FACTS**.............................................................2

    **A.**    **Plaintiff's Employment History with Sikorsky**..................2

    **B.**    **Plaintiff's Medical Leave**................................................5

    **C.**    **Sikorsky's August 2010 RIF**..........................................6

    **D.**    **Helfrich's Assessment of Schwarzkopf and the Other Supervisors**.................................................................10

        **1.**    **Helfrich's Notes**....................................................10

        **2.**    **The Ratings Helfrich Assigned**.............................16

    **E.**    **The Gear Room After the 2010 RIF**...............................26

**SUMMARY OF ARGUMENT**.......................................................28

**ARGUMENT**................................................................................29

**I.**    **Standard of Review**............................................................29

**II.**   **The Elements of Plaintiff's Disability Discrimination Claim**................29

**III.**  **The District Court Erred by Deciding Disputed Factual Issues Against Schwarzkopf and by Failing to Consider the Circumstantial Evidence of Disability Discrimination in its Totality**................................................................34

**IV.**   **A Reasonable Jury Could Find that Schwarzkopf's Disability was a Motivating Factor in the Defendant's Decision to Terminate His Employment**.......................................38

    **A.**    **Schwarzkopf Has Provided Sufficient Evidence From Which a Jury Could Conclude that His Termination Occurred Under Circumstances Giving Rise to an Inference of Discrimination**....38

    **B.**    **A Reasonable Jury Could Find that the Defendant's Proffered Reasons for Schwarzkopf's Termination Were Pretextual**.........42

**V.**    **The Cumulative Weight of the Evidence is Sufficient to Permit a Reasonable Jury to Conclude that Schwarzkopf's Disability was a Motivating Factor in the Defendant's Decision to Terminate His Employment**..............................................53

**CONCLUSION**.............................................................................56

# TABLE OF AUTHORITIES

## CASES                                                   Page(s)

Banks v. Travelers Companies, 180 F.3d 358 (2d Cir. 1999)................................31

Bickerstaff v. Vassar College, 196 F.3d 435 (2d Cir. 1999)............................31, 37

Byrnie v. Town of Cromwell, 243 F.3d 93 (2d Cir. 2001)............................passim

Carlton v. Mystic Transportation, Inc., 202 F.3d 129 (2d Cir. 2000)
    cert. denied, 530 U.S. 1261 (2000)................................................31

Cronin v. Aetna Life Insurance Co., 46 F.3d 196 (2d Cir. 1995)..........................43

Currier v. United Technologies Corporation, 393 F.3d 246 (1st Cir. 2004)....passim

Curry v. Allan S. Goodman, Inc., 286 Conn. 390 (2008).......................................30

Danzer v. Norden Systems, Inc., 151 F.3d 50 (2d Cir. 1998)..........................31, 37

Fitzgerald v. Henderson, 251 F.3d 345 (2d Cir. 2001), cert. denied
    sub nom, Potter v. Fitzgerald, 536 U.S. 922 (2002)..............................31, 37

Furnco Construction Corp. v. Waters, 438 U.S. 567 (1978).................................42

Gorzynski v. JetBlue Airways Corp., 596 F.3d 93 (2d Cir. 2010).........................29

Green v. New Mexico, 420 F.3d 1189 (10th Cir. 2005)...........................................47

Higazy v. Templeton, 505 F.3d 161 (2d Cir. 2007)...............................................37

Holcomb v. Iona Coll., 521 F.3d 130 (2d Cir. 2008)......................................passim

Howley v. Town of Stratford, 217 F.3d 141 (2d Cir. 2000)............................31, 36

- iii -

## CASES                                                                Page(s)

Kirkland v. Cablevision Sys., __ F.3d __, 2014
    U.S. App. LEXIS 14223 (2d Cir. 2014).......................................56

Knowles v. People, 15 Mich. 408 (1867).......................................51

Kwan v. Adalex Grp., LLC, 737 F.3d 834 (2d Cir. 2013).....................39

LaFond v. General Physics Services Corp., 50 F.3d 165 (2d Cir. 1995)...............37

Leibowitz v. Cornell Univ., 584 F.3d 487 (2d Cir. 2009).........................31, 38, 52

Macmillian v. City of New York, 711 F.3d 120 (2d Cir. 2013).......................29-30

McBride v. BIC Consumer Prods. Mfg. Co., Inc., 583 F.3d 92 (2d Cir. 2009)......30

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)...............................29, 32

McPherson v. New York City Dept. of Educ., 457 F.3d 211 (2d Cir. 2006).........30

Medeiros v. Pratt & Whitney Power Systems, 272 Fed. Appx. 78
    (2d Cir. 2008)...............................................................passim

Meiri v. Dacon, 759 F.2d 989 (2d Cir. 1985),
    cert. denied, 474 U.S. 829 (1985).............................................42

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).................passim

Reg'l Econ. Cmty. Action Program v. City of Middletown,
    294 F.3d 35 (2d Cir. 2002)...................................................30

Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87 (2d Cir. 2001)..........33

Stern v. Trustees of Columbia University, 131 F.3d 305
    (2d Cir. 1997)...........................................................31-32, 37, 47

## CASES                                                          Page(s)

Stratton v. Dep't for the Aging for City of N.Y., 132 F.3d 869
    (2d Cir. 1997).......................................................................33, 52

Tomasso v. Boeing Company, 445 F.3d 702 (3rd Cir. 2006)..................................46

United States v. Weinstein, 452 F.2d 704 (2d Cir. 1971).......................................51

Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013)..........................33

Washington v. Davis, 426 U.S. 229 (1976)............................................................37

Weiss v. JP Morgan Chase & Co.,332 Fed. Appx. 659 (2d Cir. 2009)............32, 47

Windham v. Time Warner, Inc., 275 F.3d 179 (2d Cir. 2001)..........................39, 47

Zimmermann v. Associates First Capital Corp., 251 F.3d 376
    (2d Cir. 2001)...................................................................................passim

## STATUTES                                                       Page(s)

Age Discrimination in Employment Act (ADEA), 29 U.S.C. §621 et seq...............2

Americans with Disabilities Act ("ADA"), 42 U.S.C §12101 et seq.......................2

Connecticut Fair Employment Practices Act (CFEPA),
    Conn. Gen. Stat. §46a-60 et seq.....................................................................2

## PRELIMINARY STATEMENT

The plaintiff, John Schwarzkopf, Jr., appeals the decision rendered by the Honorable Alfred V. Covello of the United States District Court for the District of Connecticut granting the defendant's motion for summary judgment. Judge Covello's opinion is unreported but is reproduced in the addendum to this brief at Special Appendix 1-21 and in the Joint Appendix ("JA") at JA 657-677.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The District Court had subject matter jurisdiction over this case pursuant to 28 U.S.C. §§1331, 1343 and 1367. Appellate jurisdiction is conferred by 28 U.S.C. §1291. This appeal is from a final decision entered on June 24, 2014 in which the District Court granted the defendant's motion for summary judgment as to all claims. (JA 657, 677) The plaintiff filed a timely notice of appeal on July 16, 2014. (JA 678)

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether the District Court erred by granting summary judgment in favor of the defendant where the record contained sufficient evidence from which a reasonable jury could conclude that the defendant discriminated against the plaintiff because of his disability.

## STATEMENT OF THE CASE

The plaintiff commenced this action on January 17, 2013, alleging discrimination on the basis of disability under the Americans with Disabilities Act ("ADA"), 42 U.S.C §12101, et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §46a-60 et seq.  (JA 8)  On January 15, 2014, the defendant moved for summary judgment seeking dismissal of all claims. (JA 32)  By a ruling issued on June 24, 2014, the District Court granted the motion in its entirety.[1]  (JA 657, 677)  Judge Covello concluded that the plaintiff had failed to carry his burden to permit a finding that the defendant's decision to terminate his employment was motivated by his disability. (JA 676)

## STATEMENT OF FACTS

A.     Plaintiff's Employment History with Sikorsky

Plaintiff, John Schwarzkopf, Jr. ("Schwarzkopf") is a person with a disability in that he suffers from degenerative foraminal stenosis and cervical disc rupture – conditions which are chronic and which substantially limit Schwarzkopf in major life activities including walking, standing, lifting, and twisting.  (JA 461)

---

[1] The plaintiff also alleged age discrimination pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §621 et seq. and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §46a-60 et seq., but those claims are no longer being pursued.  The plaintiff only appeals the dismissal of his disability discrimination claims.

The plaintiff was first hired by the defendant Sikorsky Aircraft Corporation ("Sikorsky") in May 1981 as an hourly employee in the Machine Shop and he worked his way up from that position for the next seven years. He voluntarily resigned and was rehired twice thereafter, working for a total of twenty years for Sikorsky. The plaintiff was most recently hired in March 2003 as a Gear Generator – Operator in the Precision Components group of Sikorsky's Product Centers organization. In about November 2005, he was promoted to his first salaried position – Gear Room Supervisor, in which he continued until his termination on December 1, 2010. (JA 55, 124, 558-562, 564)

Throughout 2010, at least until late-Summer, the plaintiff was one of five Gear Room Supervisors covering three shifts (two were assigned to the first shift, two were assigned to the second, and one was assigned to the third). Since approximately December 2007, Schwarzkopf was assigned to the first shift and, as of 2010, he supervised nineteen hourly employees in the Gear Room.[2] (JA 193, 218, 252-253, 461, 569)

---

[2] As of late summer 2010, the four other Gear Room Supervisors were Richard Norko (start date - November 5, 1984), Frank Savino (start date - April 10, 2000), Carlos Caracas (start date - June 19, 2000), and Francisco Ortiz-Perez (start date - March 22, 2010). Sikorsky is not aware of any of these Supervisors suffering from any disabilities. However, the evidence suggests not only that Norko *is* in fact *disabled*, but also that Sikorsky was aware of his disability. (JA 218, 252-253, 255, 267-268, 323-324, 326-327, 348-349, 432, 439-440, 445)

The plaintiff had two direct supervisors in 2010 – Peter Eisenman from January 2010 until about early summer; and then Paul Papadimitriou, Manager for the Gear Room. Both Eisenman and Papadimitriou reported to Nick Ioppolo, the Operations Manager for the Gear Cell – which was itself just one part of the larger Precision Components group. Ioppolo reported directly to the General Manager of Precision Components, who up until July 31, 2010, was Dave Driscoll. On August 1, 2010, however, Robert Helfrich took over Driscoll's position. Driscoll, and then Helfrich, each reported to the Vice President of Product Centers – the larger organization that included all of the Precision Components groups – Sheryln Casasanta.[3] (JA 125, 192, 212-213, 246-247, 273-274, 309, 313-314, 316, 502, 511, 571)

Schwarzkopf was very successful in his five years as a Gear Room Supervisor, earning significant merit increases each year. Based upon his performance, Schwarzkopf's salary was increased by 8% after his first full year in the new position, and by 3% each year thereafter, with the most recent increase on June 1, 2010. In February 2009 and 2010, Schwarzkopf was further granted an incentive compensation award based, at least in part, upon his individual

---

[3] Sikorsky is not aware of Eisenman, Papadimitriou, Ioppolo or Casasanta suffering from any disabilities and Driscoll and Helfrich both testified that they are not disabled. (JA 212-213, 268, 415)

-4-

performance as measured by three key metrics – delivery performance, employee safety and quality. (JA 192, 558, 576) On June 30, 2010, the plaintiff was also recognized for achieving his ACE Associate certification[4] which, according to the correspondence from the company, was "a significant accomplishment in [his] personal development and demonstrate[d] his ongoing commitment to contribute to [the company's] Operations Transformation." It is undisputed that, as of the time of his termination, Schwarzkopf was the only Gear Room Supervisor who had achieved this ACE certification. (JA 192-193, 578, 581)

B.     Plaintiff's Medical Leave

On or about July 7, 2010, the plaintiff began a medical leave of absence related to his disability and underwent cervical disc fusion surgery on August 31, 2010. There is no dispute that the defendant, and Helfrich in particular, knew the reason for the plaintiff's leave of absence was because of his physical disability. During his leave, on or about October 1, 2010, Schwarzkopf returned to Sikorsky to deliver some medical records to his supervisor. While there, the plaintiff visited the Gear Room and was introduced to the individual whom the employees said

---

[4] ACE – Achieving Competitive Excellence – is a proprietary operating system designed by the defendant's parent corporation to ensure world-class quality in its products and processes. Certification entails a multi-step, involved, process. (JA 48, 192-193)

was "filling in" for him – Vitaliy Redka.[5] (JA 195, 260, 323, 327-328, 348-349, 416, 430, 439)

About two weeks later, while still on medical leave, the plaintiff received a call from HR Manager James Foley and Helfrich, who had just assumed the role of General Manager of Precision Components.  Helfrich informed Schwarzkopf that his employment was being terminated because his position was being eliminated as part of a reduction in force ("RIF").  The plaintiff pressed for more information, but no further explanation was offered.  In late-October, Foley informed the plaintiff that his termination would be delayed until after he returned from medical leave.  The plaintiff subsequently provided Sikorsky with a note clearing him to return to work, with no restrictions, as of December 1, 2010.  His termination was effective as of that date.  (JA 193, 195, 458, 462, 481, 550, 595)

C.    Sikorsky's August 2010 RIF

Schwarzkopf's termination was part of a broader RIF which the defendant claimed was due to its business needs and a decision to restructure parts of its business and reduce its workforce.   (JA 597-605)  In anticipation of the RIF, in early August 2010, certain managers were notified that they would be conducting a comparative assessment of their staff members and that they would be trained

_____

[5] Sikorsky is not aware of Redka suffering from any disabilities.  (JA 218)

-6-

accordingly. For the Precision Components group, Helfrich was identified as the manager who would conduct the initial Assessment (the Tier 1 Assessor) for the approximately fifty salaried employees in the Precision Components group. (JA 330-332, 335, 338, 493, 526-527, 544)

Helfrich and other lower level "Assessors" attended a one-hour training in mid-August. During the training, the managers were provided with Sikorsky's "Employee Assessment Guidelines" ("the Guidelines"). Pursuant to the training materials and those Guidelines, the Assessors were to conduct "performance-based assessments" using an electronic matrix tool, the "Employee Assessment Summary," to rate and score their employees, on a relative basis, in five separate "Factors:" (1) Achieves Results; (2) Criticality of Skills; (3) Qualifications; (4) Business Orientation; and (5) Interpersonal Skills. (JA 225-242, 332, 337-341, 465-476)

Assessors were instructed that the process would utilize a "tiered approach whereby progressively higher levels of management review the assessments of the lower level manager Assessors to ensure the rankings process is consistently applied, and when viewed across their organization, represent a fair comparison of relative employee ranking;" that the Assessment was "[p]rospective looking" with the "ability of the employee to perform under current and projected business

-7-

conditions [being] the key focus;" and therefore that they "need not rely on or use past performance evaluations (PFT) or Leadership Development Review (LDR) materials," as both are "retrospective looking." (JA 229-230, 233, 468, 470)

During the week of August 16, 2010, Helfrich completed the Assessment for the salaried employees in Precision Components, including the plaintiff, notwithstanding that he had only been the General Manager of the group for a matter of days, and that he had limited or even no interaction with, or knowledge of, the personnel within his organization.[6] Helfrich fully understood that the Assessment would be used to aid in the decision-making as to which employees would actually be laid off if their position was identified for elimination, and was aware that the employees whom he rated lowest would be the most at risk for termination. Helfrich also knew that it would be up to Casasanta to ultimately decide which positions and employees would be selected for elimination. Casasanta did not conduct any independent Assessment of the employees whom

---

[6] While the Guidelines and training provided for separate reviews of the assessments done by lower level managers (by the Tier 1 and Tier 2 Assessors) before the assessments was forwarded on to the Unit Head (Tier 0), Helfrich (as a Tier 1 Assessor) completed the only Assessment for Precision Components before it was submitted to Casasanta (as the Tier 0 - Unit Head). (JA 121-124, 228, 230, 233, 331-335, 338, 342-343, 350-352, 468-469)

the lower level Assessors evaluated.[7]  (JA 125, 228, 233, 331-335, 338, 342, 344-345, 350-352, 363-364, 468-469, 472, 602)

In late August, Helfrich's Assessment was sent via HR, along with the Assessments that had been completed by other Product Center managers, to Casasanta.  Having first determined which positions would be eliminated, Casasanta decided to terminate the employees who served in those positions based upon the Assessments that she received from the lower level managers, including from Helfrich.  Casasanta testified that she typically chose those with the lowest relative ratings unless she determined that there was some particular business reason to keep someone.  (JA 125, 353-354, 602, 613-616, 618-620)

Out of the seventy-eight salaried employees with the same job title as the plaintiff in the Product Centers unit, Casasanta selected nine, including the plaintiff, for layoff.  Each of those employees were so notified on, and their

---

[7] The defendant argued below that Casasanta's testimony was not that she never "reviewed" Helfrich's Assessment, implying that such a review was done – but notably there was never any testimony from Casasanta stating that she did so "review" Helfrich's Assessment.  The defendant could have presented such testimony, and in fact it did supplement the testimony of other witnesses in the form of second declarations or additional deposition transcript pages. Accordingly, a reasonable inference is that Casasanta conducted *neither* her own independent Assessment, *nor* even a "review" of Helfrich's Assessment – which was in direct violation of the defendant's own directives that called for a "tiered review approach" and "higher levels of management review[ing the] Assessments of lower level Assessors."  (JA 230)

termination date was, September 30, 2010, except for the plaintiff.  Because he

was on medical leave, Schwarzkopf was not notified until two weeks later, when

he received the call from Helfrich and Foley.  (JA 121-124, 195, 214-215, 341,

416-418, 458, 462, 550)

### D.    Helfrich's Assessment of Schwarzkopf and the Other Supervisors

#### 1.    Helfrich's Notes

When Helfrich conducted the Assessment he had never met the plaintiff and

does not recall whether he had met any of the other Gear Room Supervisors.[8]

Helfrich claims that, after assuming the General Manager role just two weeks

earlier, he made inquiries and gathered information from his predecessor and from

his direct reports about his organization, generally, and that he continued such

efforts once he learned of the RIF.[9]  (JA 317, 319, 324-325, 329, 357-360, 365-

366, 371-372, 378, 392-393)

---

[8] A review of Helfrich's notes make clear though, that he was fully aware
that one of the existing Gear Room Supervisors – Francisco Ortiz-Perez – was
only very recently hired and had been working in that area for just a few months at
the time of the Assessment. (JA 195, 444-445, 453, 625, 638)

[9] The direct reports that Helfrich spoke with did not know about the RIF, or
about the Assessment, or that Helfrich's inquiries, or their responses thereto, were
for the purpose of aiding Helfrich in conducting the Assessment.  (JA 378, 392)

In his testimony at the CHRO and during his deposition, Helfrich could not recall any specifics about what he had been told, but he did have some general memories – which tellingly were clearest when they concerned negative comments allegedly relayed to him about the Gear Room, and about the plaintiff in particular. For example, Helfrich did recall that Driscoll had indicated that the Gear Room, as a whole, was not performing very well, that there were significant changes going on in that area and that Schwarzkopf was supposedly undermining the efforts to incorporate change into the unit. The only negative feedback that he allegedly recalled receiving from Ioppolo was also about the plaintiff. Helfrich claimed Ioppolo told him that Schwarzkopf was not supporting changes in the Gear Room, referring to the restructuring that was going on whereby the Gear Room was moving to a Lean Manufacturing concept.[10] Helfrich made notes as he was making his inquiries, gathering information about his organization, and as he was preparing for the Assessment. Those notes are revealing as to what he learned and what he considered as he did the Assessment. (JA 326, 347, 377, 380, 384-385, 420-421, 436, 455-456, 623-639)

_____

[10] The defendant has not produced any corroboration of Helfrich's claim that Ioppolo provided this feedback, nor anything that establishes that Schwarzkopf was in fact not supportive of the Lean Manufacturing changes, an allegation that the plaintiff vehemently denies. (JA 193-194)

-11-

First, despite the defendant's claimed ignorance as to the disability status of the employees who were rated and/or who were terminated or retained, Helfrich's notes suggest that he was very aware of the disability status of those he was assessing.[11]  Indeed, throughout his notes Helfrich referred to facts about the three members of his workforce who suffer from medical impairments – including about the particular illness or condition and if it was long term.  Those three employees were:  the plaintiff - about whom he included notes including, "medical," "long-term disability," "out for month for neck injury," and "long-term illness;"[12]

---

[11] Although not directly at issue in this appeal except as it bears on his credibility, Helfrich similarly denied knowing the ages of his staff, and denied that he made efforts to find out their ages.  Helfrich's contemporaneous notes directly contradict his testimony.  There are numerous references to the actual or estimated ages and/or age-related information about the personnel in his organization – including to the fact that Stu Shaftel was expected and/or planning to retire; that Scott Boddington was "55 years old;" that Charles Suller was "53;" that Diana Inthapanhya-Jones was in her "late 20s or 30s;" and that Ed Buecher was "60 years."  (JA 119-120, 429, 439-440, 447-449, 626-627, 632-634)

[12] There is also a notation of "Schwarzkopf - Cancer" which Helfrich attempted to explain away by claiming that it was not a reference to the disease, but rather referred to the plaintiff *being* a cancer insofar as he was allegedly resistant to changes in the Gear Room.  A jury, however, is not required to believe Helfrich's explanation.  This is especially so since Helfrich was not able to identify anyone ever actually calling Schwarzkopf "a cancer," and Driscoll confirmed that he was not aware of any circumstances where that term was used to describe the plaintiff.  Even if a jury were to accept Helfrich's explanation, a fact finder could still find that his use of the particular term "cancer" in such a context reveals some disability-related animus.  (JA 270, 433-434)

Richard Norko - about whom he made notes such as, "5 more weeks," "Long-term leave," "out for hip surgery, out for hip replacement....Out for a month," and "Hip;" and Jessica Millar - whom Helfrich noted had "health issues - Lupus." (JA 430, 432, 439, 444, 453-454, 626-627, 630, 638)  Helfrich rated each of these employees relatively low.[13]  (JA 123-124)  Schwarzkopf and Norko were the lowest rated of all the Gear Room Supervisors, with the plaintiff at the bottom of all the L6 Supervisors (and Norko in the bottom 3). (JA 123-124)  And for Millar at least, the low score was manipulated by Helfrich to make it more likely that she would be terminated.[14]

---

[13] The training materials indicate that an Assessment is subject to review where a rated employee is on medical leave, but there is no evidence that Sikorsky ever reviewed Helfrich's Assessment of Schwarzkopf or Norko.  (JA 121-124, 235, 349, 450-451)

[14] After Helfrich's deposition, the defendant produced a document which indicates it was saved on August 25, 2010 and was represented as being the spreadsheet that Helfrich utilized for his Assessment.  As such, that document should show the final scores that Helfrich assigned – and as they existed when the document was sent to HR and before it was rolled up with the other Assessments from throughout the rest of Casasanta's unit.  However, it is clear that this document does not include Helfrich's *final* ratings since at least one score is different on the final "rolled-up" summary version of the spreadsheet that Casasanta ultimately relied upon.  (JA 123, 125, 215-216, 613-616, 618-620, 641)

The change that is apparent when the draft is compared with the final document was an increase to the ratings and the overall score that Helfrich assigned to Robert Anderson, whereby his overall score was increased from "18" on the draft, to "22" on the final "rolled-up" version that Casasanta relied upon. This change meant that Anderson was not the lowest rated L5 Manager, but that

-13-

Although Helfrich claimed that he did not have any expectations as to how any particular individuals would be rated prior to actually sitting down to do the Assessment, a careful review of the notes tends to cast substantial doubt upon that claim. Helfrich acknowledged that he drew circles around and/or made check marks next to certain names on a hand-written organizational chart that was among his notes and that those circles and/or check marks generally appear next to the names of those employees who were ultimately selected for termination, including the plaintiff's. But, Helfrich also testified that he wrote these notes (and therefore also the circles and check marks) before and/or as he was preparing to conduct the Assessment, and thus before he should have known which employees were to be terminated. Notably, one of these circles was drawn next to Millar's name, but then was scribbled out. A jury could certainly find it significant that Helfrich included Millar (the employee with Lupus) among his notations as to which employees had been selected for termination, and then crossed that marking out – since ultimately she was not terminated despite the fact that his Assessment

---

Millar, the employee whom Helfrich had expressly noted had "health issues – Lupus," became the lowest rated ("19") in that position. (<u>Compare</u> JA 641 (Anderson, Jr., Robert) <u>with</u> JA 123 (same)). By so changing this score, a jury could readily find that Helfrich wanted to ensure that Millar, not Anderson, was the most at risk for termination if Casasanta selected an L5 Manager position for elimination.

left her as the most vulnerable employee in that position.    Based on all of these different marks and when they were made, a jury could conclude that Helfrich predetermined who he thought should be or would be laid off prior to or as he conducted his Assessment.  (JA 124, 326, 347, 384-385, 393-394, 422-424, 426, 432-433, 455, 623-626)

   With regard to the Gear Room Supervisors in particular, on one page Helfrich made a notation of "Gears 4 Folks" just above a list of the then *five* existing Gear Room Supervisors, suggesting that he knew there would be, or at least that he wanted there to be, one less Gear Room Supervisor after the RIF.  On another organizational chart on a different page of Helfrich's notes, he writes "OK" under both Caracas and Ortiz-Perez, though no such notation appears under the names of the other Gear Room Supervisors who also appear on that chart.  A finder of fact could certainly infer that Helfrich's "OK" markings meant that these two would be safe in his Assessment and/or the RIF, especially since those two ended up tied with the highest rating out of all the Gear Room Supervisors.  (JA 445-446, 453 454, 630, 638)

   There is also a sticky note that Helfrich testified he stuck to one of the last pages of his notes as a follow up after he had completed the Assessment and after he had been informed about the actual eliminations.  A jury may consider that this

-15-

sticky note was added to the very page that showed the Gear Room to be significant evidence that Helfrich was targeting this group – where he knew two of the employees were disabled, and further that on one half of that note Helfrich listed the employees who were in fact job eliminated, including the plaintiff.  (JA 453, 455-456, 638-639)

2.    The Ratings Helfrich Assigned

Helfrich explained that in doing the Assessment, he assigned scores in the five Factors relative to the other individuals in the same job classification, based on their job function or role and in the same labor grade, and then he added those scores directly into the Matrix tool that was sent on to Casasanta.  With regard to the Gear Room Supervisors, Helfrich claimed that he assessed them relative to all of the other supervisors in the L6 labor grade with production function.  Helfrich identified the individuals as: each of the then-Gear Room Supervisors – (1) Schwarzkopf, (2) Norko, (3) Savino, (4) Ortiz-Perez, and (5) Caracas; as well as the following production supervisors from other groups within Precision Components – (6) Jose Figueroa, (7) Vitaliy Redka,[15] (8) Michael Rupsis, (9) Melicent Keel-Romano, (10) Bruce Buzzelle, and (11) Charles Suller.  When

_____

[15] Redka was hired by the defendant on March 29, 2010 and Helfrich was aware of his hire date.  (JA 218, 425, 624)

-16-

Helfrich compared and rated those eleven individuals in the five Factors, the plaintiff finished with the lowest overall score, and Norko was third from the bottom. (JA 120-124, 281, 286, 353-356, 367, 385-392, 395-396)

Helfrich did his Assessment without directly involving anyone else. (JA 378, 391-392) In stark contrast, Driscoll, who was also new to his organization at the time of his Assessment, assigned his scores "in concert with two of the managers that reported to [him]," expressly making those individuals aware that they were conducting a comparative assessment and of the exact Factors that were being considered in the Assessment. When asked why he involved his direct reports, Driscoll was clear – "I brought them in because I was new in the organization...So I wanted to get additional input in the scoring." (JA 277-280) A jury could certainly find it revealing that Helfrich chose not to take similar measures to ensure his scores were accurate, and infer from that decision that he had another agenda in conducting his Assessment.

Despite the fact that the training materials expressly cautioned that, as an Assessor Helfrich should be able to "explain [his] rankings in 2-3 sentences, and provide examples to support [his] conclusion," and Helfrich claimed that he complied with that directive and was "comfortable after [he] did his assessments" that he could do just that "for every employee [he] assessed," during his deposition

Helfrich could not provide justification for any of the scores he assigned to Ortiz-Perez, to Caracas, to Norko, to Redka, or to any other of the approximately forty-five employees whom he evaluated (other than two of his direct reports, Ioppolo and Pawlowicz).  Rather, the only employee for whom he was able to explain his ratings was the plaintiff.  (JA 235, 345, 411-412)

In the first Factor, "Achieves Results: How does the employee apply strengths and abilities to achieve meaningful results, as compared with others in the employee's grade and functional role?" – Helfrich testified that, for the L6 Supervisors, he understood the factor to be assessing "lead time reduction" (by which he meant, "from the time you start working on a part until...the time you've delivered the part") and "cost of poor quality" (by which he meant, "how much money you spend on scrap rework and repair").  (JA 232, 400-401) Although there was objective, quantitative information by which both lead time reduction and cost of poor quality are measured by the defendant, Helfrich did not obtain or use those available measurables to assess the plaintiff or the L6 Supervisors.  Instead, he opted to rely upon totally subjective, qualitative, anecdotal information that he had allegedly learned, generally, over the prior weeks from his direct reports.[16]  (JA

_____

[16] Ortiz-Perez received the highest score of anyone in this Factor (except for Suller, who had the same score) – receiving an 8 (out of 10) – notwithstanding that he had only been working for the defendant for a few months as of the time of the

-18-

400-401, 414)  Moreover, in explaining the "relatively low" score of 4 (out of 10) that he gave to the plaintiff in this category, Helfrich said nothing about the plaintiff's performance as to lead time reduction or cost of poor quality, but stated that the score was because Schwarzkopf "was not applying his strengths (referring to gear manufacture and how gears are produced) to achieve meaningful results with regard to the changes that were being driven in the gear room."  (JA 406-407)

With respect to the next Factor, Criticality of Skills:  How critical, or unique (where uniqueness is important), or broad and versatile (where broadness and versatility are important) are the employee's skills and does the employee apply these skills to changing business conditions, as compared with others in the group?"  Helfrich explained that he considered,

> the job code or job classification, how unique – was there anything specific that was required that was a unique skill set or a unique talent required to perform a particular function...

(JA 232, 402)  In giving the plaintiff a 6 (out of 10), Helfrich explained that he believed the defendant "could train other supervisors to do work in the gear room or the work in other areas of the shop.  So it wasn't – the Supervisor position

---

Assessment.  However, Helfrich had never met Ortiz-Perez, did not recall receiving any feedback from Driscoll or Ioppolo about him, and could not offer a justification for the high score.  (JA 379-381, 409-410, 425-426, 444-445, 453-454, 625, 629-630, 638)  As such, a finder of fact could easily question the legitimacy of the rating.

wasn't – the skill set was not critical, they were somewhat fungible or you could move people around." (JA 400) Based upon such explanation, one might have expected that the individuals in this L6 Supervisor position would have received the same score but instead the scores ranged from 5 to 7 – despite the "lack of uniqueness for the position." (JA 122-124, 400) Again, Helfrich could not offer any justification for the higher or lower scores he assigned. (JA 411-412)

Helfrich testified that for the Factor of "Qualifications: How do the employee's qualifications (i.e. qualifying education, skills, training and technical knowledge) and his/her use of those qualifications compare with others in the employee's grade and functional role?" – he considered "How that particular individual applied his knowledge and skills to conduct his job in comparison to others...in that role. That job function." Helfrich stated that the basis for rating Schwarzkopf a 3 (out of 5) here was "his job history having worked in the gear shop in the past (as an hourly employee and had run the machines and therefore was knowledgeable of elements of the gear manufacturing) and being a supervisor in the gear shop," which he considered a positive. Yet, he rated nearly every other L6 Supervisor the same, even though there is no evidence that any others had previously run the machines, and notwithstanding that Helfrich knew that two of

-20-

them had only joined Sikorsky a few months earlier.  (JA 122-124, 195, 218, 232, 403, 408-409, 425, 444-445, 624-625, 638)

As to the fourth Factor, "Business Orientation: How does the employee see the big picture and work toward meeting overall business requirements, as compared with others in the employee's grade and functional role?" – Helfrich said what he was looking at was "Does the employee understand the overall arching [sic] objectives and goals of the business.  And how were they working together to achieve those."[17]  Helfrich assigned the plaintiff a score of 2 (out of 5), and in so doing claimed that he considered the reports from Driscoll and Ioppolo about the plaintiff supposedly not being supportive of changes in the Gear Room and/or his allegedly undermining the efforts to incorporate the Lean Manufacturing changes in the group.[18]  (JA 232, 403-405, 409-410)  But the claims about the plaintiff being an "impediment" to such changes or regarding his "resistance" to the implementation of Lean Manufacturing principles are belied by the record evidence.  (JA 193-194, 196-209)

---

[17] Ortiz-Perez again had the highest score of anyone in this Factor – receiving a 4 (out of 5).  Notably, it was the plaintiff who trained Ortiz-Perez in his first months.  (JA 122, 195)

[18] Helfrich could not identify any other Factor in which he gave consideration to this information when he was assigning Schwarzkopf's ratings as compared to the other L6 Supervisors.  (JA 404-405, 409-410)

-21-

As the plaintiff's Affidavit makes clear, he was actively and voluntarily involved in a Gears 3P Event ("Product, Preparation and Process") in October 2009, the focus of which were the very Gear Room changes that the defendant claims Schwarzkopf did not support.  (JA 193-194, 196-209)  The plaintiff attended numerous meetings in the weeks leading up to the 3P Event, was actively involved in the planning and preparation work, and then not only went to the week-long Event, but offered to take the lead for his team during two of the main presentations.[19]  Given that Schwarzkopf was the only Gear Room Supervisor who agreed to participate in this Event, whereas Norko, Savino and Caracas (the other Gear Room Supervisors at the time) refused, thought it was a "waste," and/or were openly hostile about it,[20] the record demonstrates that the plaintiff was *supportive* of the Lean Manufacturing changes in the Gear Room, and that the only resistance came from the other supervisors whom Helfrich nonetheless rated higher in the

---

[19] Further, a jury could easily conclude that the plaintiff's participation and performance in relation to the 3P Event must have been satisfactory, since afterwards, Moffitt (the leader of the Event) asked Schwarzkopf about his interest in continuing as a Supervisor when the New Gear Room was set up.  (JA 194)

[20] None of the other non-Gear Room L6 Supervisors whom Helfrich rated against plaintiff participated in this 3P Event either.  (JA 196)

Business Orientation Factor.[21]  (JA 193-194)

Lastly, in "Interpersonal Skills: How well does the employee work with others and leverage skills and talents to gets tasks accomplished, as compared to others in the group?" – Helfrich stated that he applied that based upon "How well does the employee work with other folks to get the job done."[22]  Although Helfrich gave the plaintiff the lowest possible score in this category, a 1 (out of 5) – the only 1 rating that was assigned to any member of the comparator group in this Factor – he could not offer any justification for that rating.[23]  (JA 122-124, 232, 403-404, 410)  A jury could infer that Helfrich considered the fact that

---

[21] Given that Schwarzkopf's participation in the 3P Event demonstrates that he was supportive of the changes in the Gear Room, a jury could also question the accuracy of the low score that Helfrich assigned in the Achieves Results Factor – which he claimed was because the plaintiff "was not applying his strengths to achieve meaningful results with regard to the changes that were being driven in the gear room."  (JA 406-407)

[22] Ortiz-Perez again had the highest score of anyone in this Factor (except Caracas and Buzelle, who each received the same score) – receiving a 4 (out of 5), and again Helfrich could not offer any justification for the higher rating.  (JA 122-124, 410-411)

[23] The defendant suggested below that Helfrich must have based this rating on the fact that someone might have told him that the plaintiff was "a cancer" in the Gear Room, but Helfrich never testified that there was any connection between that alleged comment and the ratings he assigned to Schwarzkopf.  (JA 433-434)

Schwarzkopf was out on medical leave and was therefore not "working well with others to get the job done."

Helfrich acknowledged during the administrative stage of the case that there was significance in an employee being an ACE associate in that it showed continuous improvement on a moving forward basis. Later, Helfrich denied that an employee's ACE certification level would have been a consideration in any of the Factors he assessed, but he also admitted that whether the employee was demonstrating ACE practices would have been relevant and impacted the Assessment in "driving business results," "driving down cost of poor quality" and "helping to implement Lean Manufacturing."[24]  From these comments, a reasonable factfinder could readily infer that the plaintiff's ACE certification and practices *should* have been a relevant consideration in providing an honest assessment at least in the Factors of Achieves Results and Business Orientation, based upon Helfrich's own testimony about what he was looking for in those categories. While the plaintiff became ACE certified in June 2010, none of the other Gear Room Supervisors were so certified at that time, nor was Redka, yet

---

[24] Driscoll also explained that there is a connection between ACE and Lean Manufacturing. (JA 261)  This connection is further obviated by the correspondence that the plaintiff received with his ACE certification, which noted that the "accomplishment...demonstrate[d] his ongoing commitment to contribute to [the company's] Operations Transformation." (JA 576)

each of them was rated the same or higher than plaintiff in both of these Factors.

(JA 400-401, 404-405, 409-410, 412-414, 516, 579, 581)

The defendant has attempted to bolster the credibility of Helfrich's relative

Assessment of the plaintiff and suggested that it is an accurate evaluation of

Schwarzkopf's skills and competencies because it is supposedly in line with two

similar assessments that were previously done by Driscoll – namely (1) one done

in April 2009 in connection with a prior RIF, and which utilized the very same

process and Factors, also on a prospective basis (JA 71-73), and (2) one done by

Driscoll in April/May 2010 in connection with the salary planning process, which

likewise used a relative evaluation in the same Factors. (JA 90-92)  But a careful

comparison with those prior assessments only serves to raise more questions about

the legitimacy of Helfrich's 2010 RIF Assessment.  First, of the eight other L6

Supervisors whom Helfrich rated against the plaintiff in 2010,[25] in Driscoll's 2009

RIF Assessment, five ranked lower than Schwarzkopf (whom he gave an overall

score of 27) – Rupsis (19), Keel-Romano (25), Savino (25), Figueroa (26), and

Suller (26); two ranked the same – Norko (27) and Buzzelle (27); and one was

rated higher – Caracas (28), but only by a single point. (JA 71-73)  As to salary

---

[25] Ortiz-Perez and Redka were not rated in the 2009 RIF Assessment since
both were hired in March 2010.  See, notes 2 and 15 supra.

planning process Assessment that Driscoll did in April/May 2010 – just a couple of months before Helfrich's Assessment, of the ten L6 Supervisors Helfrich rated against the plaintiff in 2010, Driscoll rated three lower than Schwarzkopf (whom he gave an overall score of 15) – Keel-Romano (14), Ortiz-Perez (10) and Redka (5). (JA 90-92, 223-224, 282, 285, 297-303) Accordingly, the prior relative ratings done by Driscoll do not corroborate the scores that Helfrich assigned in the 2010 RIF Assessment, but instead cast substantial doubt upon the credibility of Helfrich's Assessment.

     E.    <u>The Gear Room After the 2010 RIF</u>

At the time that plaintiff went out on medical leave in July 2010, and throughout the period that Helfrich was conducting the Assessment in August, there were five Gear Room Supervisors – Schwarzkopf, Norko, Savino, Ortiz-Perez and Caracas. Plaintiff was informed in mid-October 2010 that he was being terminated, allegedly because his position was being eliminated. Just prior to this time though, Redka, a non-disabled L6 Supervisor whom Helfrich assessed against the plaintiff, was transferred into the Gear Room – before Schwarzkopf was even told that he was being terminated. Moreover, Redka assumed all of the first shift duties and responsibilities that Schwarzkopf had been performing when he went

-26-

out on leave, including supervising all of the plaintiff's direct reports.[26]  (JA 195, 266, 268-269, 416, 418, 458, 462, 550, 651-652)  The plaintiff's termination did not become effective until two months after Redka took over for him in the Gear Room.  Redka remained in the first shift Gear Room Supervisor position, supervising the same employees as had the plaintiff, until Redka resigned on May 20, 2011. (JA 217, 481, 595)

Following his termination, Schwarzkopf repeatedly reapplied to Sikorsky – even applying to lower level, non-supervisory positions in the Gear Room.  In or about September 2011, the defendant transferred another Sikorsky employee, Matt Beurer,[27] into the Gear Room as a "replacement for [ ] Redka."  The defendant argued below that the plaintiff could not have been considered for this position because it was only open to "internal" candidates.  But a jury could infer that the defendant so limited the position in order to exclude Schwarzkopf from consideration, since the defendant was well aware that the plaintiff was actively seeking re-employment – as of the date that Beurer was moved into the Gear

---

[26] The plaintiff's direct reports when he was the first shift Gear Room Supervisor are listed below his name on one of the organizational charts that is among Helfrich's notes.  The list is the same as those hourly employees who were reporting to Redka as of October 20, 2010 as detailed on another such chart. (JA 193, 311.  Compare JA 629 with JA 571)

[27] Sikorsky is not aware of Beurer suffering from any disabilities.  (JA 218)

-27-

Room, he had already re-applied no less than seven times.[28]  (JA 218-219, 654,

656)

## SUMMARY OF ARGUMENT

The District Court's grant of summary judgment as to the disability

discrimination claims must be reversed because the Court patently disregarded the

standards applicable to the determination of sufficiency of evidence questions in

employment discrimination cases.  More particularly, the District Court failed to

consider the cumulative weight of the record evidence – including the evidence

constituting the plaintiff's strong *prima facie* case and the ample evidence that

could support a finding of pretext – in its totality and in the light most favorable to

the plaintiff.  Instead, Judge Covello ignored much of the record evidence and

examined the evidence in a piecemeal fashion after analyzing it as if he were the

trier of fact.

Analysis of the record, in accordance with the established standards for

reviewing summary judgment in employment discrimination cases, demonstrates

---

[28] The most recent of the plaintiff's applications, as of the time of Beurer's transfer, was May 29, 2011 – just two weeks after Redka had resigned.  Since Beurer's start in the Gear Room, the plaintiff has applied three more times including specifically for Gear Room Supervisor positions on November 19, 2012, and August 19, 2013.  But even after ten applications for various positions, Sikorsky has not rehired the plaintiff.  (JA 654)

that there is more than sufficient evidence from which a reasonable jury could find that Schwarzkopf's disability was a motivating factor in the comparative assessment that resulted in Sikorsky's decision to terminate his employment.  As detailed below, Schwarzkopf presented a solid *prima facie* case and there is much evidence from which a jury could find that the defendant's explanation for selecting Schwarzkopf for termination was pretextual and that his disability was a motivating factor.  Accordingly, based on the totality of the record evidence, the grant of summary judgement should be reversed and the case remanded for trial.

## ARGUMENT

### I.    Standard of Review

This Court reviews a grant of summary judgment *de novo*, resolving all factual ambiguities and crediting all inferences in favor of the non-moving party, and will affirm only if the record shows that there is no genuine issue as to any material fact and that the defendant is entitled to judgment as a matter of law. Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010).

### II.    The Elements of Plaintiff's Disability Discrimination Claim

Schwarzkopf's disability discrimination claims, under federal and state law, are analyzed under the burden-shifting framework established in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Macmillian v. City of New

York, 711 F.3d. 120, 125-126 (2d Cir. 2013); Curry v. Allan S. Goodman, Inc.,

286 Conn. 390, 426 (2008).  Under this four step framework, a plaintiff must first

establish a *prima facie* case by showing that: (1) his employer is subject to the

[act]; (2) he was disabled within the meaning of the [act]; (3) he was otherwise

qualified to perform the essential functions of his job, with or without reasonable

accommodation; and (4) he suffered adverse action because of his disability.

Macmillian, 711 F.3d at 125.  The plaintiff's burden at this stage can be met even

by a "minimal" showing.  Reg'l Econ. Cmty. Action Program v. City of

Middletown, 294 F.3d 35, 49-50 (2d Cir. 2002).

　　　If the plaintiff meets his burden, he is then "aided by a presumption of

discrimination unless the defendant proffers a 'legitimate, nondiscriminatory

reason' for the adverse employment action, in which event, the presumption

evaporates and the plaintiff must prove that the employer's proffered reason was a

pretext for discrimination."  McPherson v. New York City Dept. of Educ., 457

F.3d 211, 215 (2d Cir. 2006); McBride v. BIC Consumer Prods. Mfg. Co., Inc.,

583 F.3d 92, 96 (2d Cir. 2009).  Put another way, the plaintiff "carries the ultimate

burden of persuasion and must produce evidence such that a rational finder of fact

could conclude that the adverse action taken against [him] was more likely than

not a product of discriminatory animus." Leibowitz v. Cornell Univ., 584 F.3d 487, 504 (2d Cir. 2009).

It is well established that in assessing whether the plaintiff has met his burden, the court's task "is to examine the entire record and, in accordance with Reeves [v. Sanderson Plumbing Prods. Inc.], make the case-specific assessment as to whether a finding of discrimination may reasonably be made." Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 382, (2d Cir. 2001). To carry his burden, a plaintiff may rely on the evidence presented to establish his *prima facie* case, without more. Leibowitz, 584 F.3d at 504. Or, a plaintiff may rely "on the evidence constituting the *prima facie* case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason for the adverse action."[29] Carlton v. Mystic Transportation, Inc., 202 F.3d 129,

---

[29] Because direct evidence of discrimination is seldom available with respect to an employer's mental processes, in presenting evidence of pretext plaintiffs may rely on the cumulative weight of circumstantial evidence. Carlton, 202 F.3d at 135; Banks v. Travelers Companies, 180 F.3d 358, 367 (2d Cir. 1999); Danzer v. Norden Systems, Inc., 151 F.3d 50, 56-57 (2d Cir. 1998). The determinative question is whether the evidence can "reasonably and logically" give rise to an inference of discrimination under all of the circumstances. Bickerstaff v. Vassar College, 196 F.3d 435, 447 (2d Cir. 1999). Accordingly, "the court should view the record in its totality, rather than in a piecemeal fashion." Fitzgerald v. Henderson, 251 F.3d 345, 360 (2d Cir. 2001), cert. denied sub nom, Potter v. Fitzgerald, 536 U.S. 922 (2002); Medeiros v. Pratt & Whitney Power Systems, 272 Fed. Appx. 78, 80 (2d Cir. 2008); Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000); Bickerstaff, 196 F.3d at 448; Danzer, 151 F.3d at 57; Stern v.

147 (2d Cir. 2000), <u>cert. denied</u>, 530 U.S. 1261 (2000).  <u>See</u>, <u>Reeves</u>, 530 U.S.

113, 147 (2000).

>    As this Court has noted,

>    [a]t th[is] final stage of the <u>McDonnell Douglas</u> analysis, the plaintiff's
>    burden of proving that he was the victim of intentional discrimination
>    merges with his burden of proving that the employer's reasons are
>    pretextual.  The Supreme Court has held that 'a *prima facie* case and
>    sufficient evidence to reject the employer's explanation may permit a
>    finding of liability,' and it is error to 'proceed[] from the premise that a
>    plaintiff must always introduce additional, independent evidence of
>    discrimination.' '[A]n employee may satisfy the ultimate burden of proving
>    pretext 'either directly by persuading the court that a discriminatory reason
>    more likely motivated the employer or indirectly by showing that the
>    employer's proffered explanation is unworthy of credence.''

<u>Weiss v. JPMorgan Chase & Co.</u>,332 Fed. Appx. 659, 661 (2d Cir. 2009) (internal

citations omitted).  <u>See also</u>, <u>Holcomb v. Iona College</u>, 521 F.3d 130, 141 (2d Cir.

2008); <u>Zimmermann</u>, 251 F.3d at 381-382.  As the Supreme Court noted, "once

the employer's justification has been eliminated, discrimination may well be the

most likely alternative explanation, especially since the employer is in the best

position to put forth the actual reason for its decision."  <u>Reeves</u>, 530 U.S. at 147.

---

<u>Trustees of Columbia University</u>, 131 F.3d 305, 314 (2d Cir. 1997).  <u>See also</u>,
<u>Byrnie v. Town of Cromwell</u>, 243 F.3d 93, 102 (2d Cir. 2001) ("A combination of
factors, any of which judged on their own would be much less compelling, provide
sufficient evidence to allow a reasonable jury to conclude that [the employer's]
explanation...was a pretext for impermissible discrimination.")

Moreover, the "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." Holcomb, 521 F.3d at 138.  See also, Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2522-2523, 2526 (2013) ("An employee who alleges status-based discrimination...need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act. So-called but-for causation is not the test.")  The ultimate question is whether a reasonable person could find that the adverse employment action complained of was motivated at least in part by prohibited discrimination. Stratton v. Dep't for the Aging for City of N.Y., 132 F.3d 869, 878 (2d Cir. 1997).

As this Court has previously recognized, "the Supreme Court has indicated that only occasionally will a *prima facie* case plus pretext fall short of the burden a plaintiff carries to reach a jury on the ultimate question of discrimination..." Zimmermann, 251 F.3d at 382, citing Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 94 (2d Cir. 2001) (further citing, Reeves, 530 U.S. at 148) (Emphasis added).  Two scenarios were set forth in Reeves as examples:

> One is where the record 'conclusively revealed some other, nondiscriminatory reason for the employer's decision.' A second is where the 'plaintiff created only a weak issue of fact as to whether the employer's

reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.' Justice Ginsburg expressed the view that 'circumstances in which plaintiffs will be required to submit evidence beyond evidence establishing a *prima facie* case and evidence permitting a finding that a proffered explanation was false 'in order to survive a motion for judgment as a matter of law . . . will be uncommon.' (Ginsburg, J., concurring).

Zimmermann, 251 F.3d at 381 (internal citations omitted).

## III. The District Court Erred by Deciding Disputed Factual Issues Against Schwarzkopf and by Failing to Consider the Circumstantial Evidence of Disability Discrimination in its Totality

In December 2004 and April 2008 respectively, the First and Second Circuit

Courts of Appeals decided cases (against entities that are related to this defendant)

which are strikingly similar to Schwarzkopf's present action (except there the

claim was age discrimination) – Medeiros v. Pratt & Whitney Power Sys., 272

Fed. Appx. 78 (2d Cir. 2008) and Currier v. United Technologies Corporation, 393

F.3d 246 (1st Cir. 2004). In each case, a former employee challenged his

termination under a RIF in which he was scored against other employees by a

supervisor using a comparative assessment tool that evaluated employees in the

same exact subjective categories that were used by Sikorsky here to assess

Schwarzkopf. See, Medeiros, 272 Fed. Appx. at 79; Currier, 393 F.3d at 249. In

both, the Courts concluded that the plaintiffs had established *prima facie* cases,

that the employers arguably met their burden to articulate a legitimate reason for

-34-

the terminations,[30] and ultimately that there was sufficient evidence from which a jury could find that the defendants' reliance upon the results of the comparative assessment was a pretext for discrimination. Medeiros, 272 Fed. Appx. at 79-81; Currier, 393 F.3d at 254-256.

In reaching that conclusion, the Courts of Appeals considered similar evidence to that which Schwarzkopf offers here – the entirely subjective nature of the Assessment (Medeiros, 272 Fed. Appx. at 79; Currier 393 F.3d at 255); the fact that Helfrich was only in his role a short time when he did the Assessment (Medeiros, 272 Fed. Appx. at 80, 81); vague and even contradictory explanations as to the basis for the plaintiff's relative scores (Currier, 393 F.3d at 255); the comparative work history and experience of the employees retained, especially employees with only months of comparable experience (Medeiros, 272 Fed. Appx. at n.4; Currier, 393 F.3d at 255); that the plaintiff's low ratings did not accurately reflect his capabilities, in particular because of his recent successes (Medeiros, 272 Fed. Appx. at n.3 and 81; Currier, 393 F.3d at 255); and that the most recent former manager – Driscoll, who had a significantly longer tenure than Helfrich

---

[30] Medeiros did note, however, that "a reasonable jury could conclude that one supervisor's assigning numbers merely based upon his own subjective evaluation of different aspects of a subordinate's job performance provides, at best, only unclear and non-specific reasons for that employee's termination." 272 Fed. Appx. at n.2.

and therefore a much deeper base of personal knowledge, recently conducted two

similar assessments of the same group of employees, in the same Factors, and in so

doing assigned very different scores from Helfrich's (<u>Medeiros</u>, 272 Fed. Appx. at

80-81). As the First Circuit Court concluded in <u>Currier</u>, "this evidence amply

supports a jury conclusion of pretext in [the] ranking..." 393 F.3d at 255.

      Notwithstanding the fact that the <u>Medeiros</u> and <u>Currier</u> decisions were

discussed by both parties below (JA 673, 675), the District Court did not reference

either case in its analysis and ignored their holdings. Instead, Judge Covello

improperly assessed certain strands of the record evidence and individually

dismissed most of those strands outright as "not sufficient" rather than taking the

cumulative weight of the record evidence into consideration in its totality. (JA

675-676) Applying this compartmentalized reasoning, the Court erroneously

concluded that the plaintiff "failed to carry his burden." (JA 676) As this Court

has explained though,

> In determining the appropriateness of summary judgment, the court should
> not consider the record solely in piecemeal fashion, giving credence to
> innocent explanations for individual strands of evidence, for a jury, in
> assessing whether there was impermissible discrimination and whether the
> defendant's proffered explanation is a pretext for such discrimination, would
> be entitled to view the evidence as a whole

<u>Howley</u>, 217 F.3d at 150 (internal citations omitted). <u>See also</u>, <u>Medeiros</u>, 272 Fed.

Appx. 80; Fitzgerald, 251 F.3d at 360; Byrnie, 243 F.3d at 102; Bickerstaff, 196

F.3d at 448; Danzer, 151 F.3d at 57; Stern, 131 F.3d at 314; and Cf., Washington

v. Davis, 426 U.S. 229, 242 (1976) ("an invidious discriminatory purpose may

often be inferred from the totality of the relevant facts.")

  Moreover, as will be discussed below, in its assessment of the record the

District Court analyzed the evidence as if it was the trier of fact and it failed to

draw reasonable inferences in the plaintiff's favor.  That approach is directly

contrary to this Court's often repeated admonition that when ruling on a motion

for summary judgment the trial court's role "is carefully limited to discerning

whether there are any genuine issues of material fact to be tried, *not* to deciding

them.  Its duty, in short, is confined at this point to issue-finding; it does not

extend to issue-resolution." LaFond v. General Physics Services Corp., 50 F.3d

165, 171 (2d Cir. 1995) (internal citations omitted) (emphasis in original);

Medeiros, 272 Fed. Appx. at n. 2 and 80 ("On a motion for summary judgment a

district court must consider the evidence in the context of whether *any* reasonable

finder of fact – not merely the district court itself – could return a verdict in favor

of the non-moving party"), citing Higazy v. Templeton, 505 F.3d 161, 168-169 (2d

Cir. 2007).  See also, Reeves, 530 U.S. at 151 (directing that when ruling on a

motion for judgment as a matter of law, the trial court "must disregard all evidence

-37-

favorable to the moving party that the jury is not required to believe."); Holcomb, 521 F.3d at 137.

An evaluation of the cumulative weight of the record evidence in accordance with these governing principles, requires that the District Court's grant of summary judgment be reversed.

## IV. A Reasonable Jury Could Find that Schwarzkopf's Disability was a Motivating Factor in the Defendant's Decision to Terminate His Employment

### A. Schwarzkopf Has Provided Sufficient Evidence From Which a Jury Could Conclude that His Termination Occurred Under Circumstances Giving Rise to an Inference of Discrimination

The defendant here does not challenge that Schwarzkopf has established the first three elements of his *prima facie* case and indeed the record is clear as to those elements.[31]  With regard to the fourth element, it is sufficient for the plaintiff to show that the defendant treated him less favorably than similarly situated employees outside of the protected class or to rely upon the sequence of events leading to the discharge.  Leibowitz, 584 F.3d at 502.  In the context of "a

---

[31] The defendant is clearly covered by the Act.  The plaintiff is disabled in that he suffers from degenerative foraminal stenosis and cervical disc rupture – conditions which are chronic and which substantially limit him in several major life activities.  Since Schwarzkopf worked for the defendant for a total of approximately twenty years before being terminated, his final five years working as a Supervisor, there can be no doubt that he was qualified to perform his job at the time he was terminated.

-38-

reduction in force, the inquiry is highly fact specific." <u>Windham v. Time Warner,</u> <u>Inc.</u>, 275 F.3d 179, 187 (2d Cir. 2001).  Here, the record easily supports a finding that Schwarzkopf's termination occurred under circumstances giving rise to an inference of disability discrimination.[32]

As an initial matter, the defendant has disputed whether the individual decision-makers – i.e., Helfrich and Casasanta – knew of the plaintiff's disability.[33]  A review of Helfrich's own notes reveal that this claim is baseless. The notes make clear that, as of the time he conducted the Assessment, Helfrich was aware that the plaintiff was out on a medical leave and that the reason for that leave was due to Schwarzkopf's own physical impairment.  Indeed, the notes

---

[32] Judge Covello properly concluded that the plaintiff had presented "sufficient facts, at the *prima facie* stage of the case, to support his claim" that he was terminated "because of his disability." (JA 671)  More particularly, the Court agreed that the record evidence, namely Helfrich's notes, "indicate some knowledge of the fact that Schwartzkopf [sic] was suffering from a condition that rendered him unable to work." (JA 671-672)  And it concluded that such facts, when coupled with the temporal quality of the termination, "in relation to [the plaintiff's] medical leave of absence," are "sufficient to support of *prima facie* case of disability discrimination." (JA 672)

[33] It is beyond dispute that the record reveals at least corporate knowledge of the plaintiff's disability insofar as Sikorsky was aware of the medical necessity and at least some specific details regarding the nature and extent of the plaintiff's condition – including the need for surgical intervention and ongoing medical care and the duration of the leave.  The existence of such corporate knowledge suffices for the purpose of establishing knowledge for the plaintiff's *prima facie* case.  <u>See,</u> <u>Kwan v. Adalex Grp., LLC</u>, 737 F.3d 834, 844-845 (2d Cir. 2013).

-39-

about the plaintiff read as follows: "medical," "long-term disability," "out for

month for neck injury" and "long-term illness."[34]    These notations show much

more than a mere awareness of the fact that Schwarzkopf was absent from work.

A jury could find that Helfrich knew that the plaintiff was absent because of his

own medical condition, that it rendered him unable to work, and that such

condition was "long-term" or chronic.  This evidence is more than sufficient to

support an inference that Helfrich was aware that Schwarzkopf was disabled.

Returning to the final *prima facie* element, the record clearly gives rise to an

inference that the plaintiff was terminated because of his disability.  First, a review

of Helfrich's Assessment reveals that he assigned the lowest scores of any of the

Gear Room Supervisors to the two individuals whom he knew suffered from

disabilities – the plaintiff and Norko, and indeed the plaintiff was rated the lowest

of all eleven L6 Production Supervisors (with Norko in the bottom 3).  In the

Assessment of the L5 Manager group, the notes reveal that Helfrich actually

altered the scores such that the third employee he knew was disabled – Millar,

would be at risk for termination if an L5 Manager position was identified for

elimination. Helfrich's notes about the plaintiff, Norko and Millar reveal an

apparent fixation on their disability statuses.  A jury could certainly infer from this

---

[34] As discussed at note 12, the additional notation of "Schwarzkopf - Cancer" may also support an inference of disability discrimination.

-40-

evidence that Helfrich intentionally treated them less favorably than the non-disabled employees.  Moreover, the very fact that Helfrich included numerous notations about the medical conditions of his disabled employees – while he was preparing for and as he was conducting the Assessment, could itself be viewed by a jury as evidencing a hostility toward disabled employees.

Lastly, the record reveals that a non-disabled employee – Redka,[35] was brought into the Gear Room as a first shift Supervisor, in or before early-October 2010 – at least two weeks before the plaintiff was told about the RIF and two months before he was actually terminated.  The plaintiff was introduced to Redka and was expressly told that Redka was "filling in" for him.  Also, the affidavit from the first shift Leadman in the Gear Room – Randy Leonard, establishes that Redka assumed all of the plaintiff's duties and had responsibility for the same hourly employees whom Schwarzkopf had been supervising.

This evidence, separately and collectively, is more than sufficient for a jury to find that the RIF, at least as it was conducted through Helfrich's Assessment, occurred under circumstances giving rise to an inference of disability discrimination, especially in light of the plaintiff's minimal burden.

---

[35] A reasonable juror could infer from the *absence* of any reference in Helfrich's notes to Redka having any sort of illness or physical impairment, that Helfrich did not know Redka to be disabled.  Also, the defendant admitted in its interrogatory responses that Redka was not known to suffer from any disability.

B.    A Reasonable Jury Could Find that the Defendant's Proffered
Reasons for Schwarzkopf's Termination Were Pretextual

Because the plaintiff has successfully established a solid *prima facie* case of

disability discrimination, the employer must articulate a legitimate non-

discriminatory explanation for the termination.  Sikorsky contends that the

termination was the result of a broader RIF and that the plaintiff was terminated

based upon Helfrich's relative rankings in the Assessment – specifically, that

Schwarzkopf was terminated because he was rated lowest of the eleven L6

Supervisors whom Helfrich assessed.  Assuming that reliance on Helfrich's

Assessment passes muster as a legitimate, non-discriminatory reason for the

decision to terminate Schwarzkopf,[36] then the burden shifts to the plaintiff to offer

evidence that this explanation was a pretext for disability discrimination.  A

reasonable jury could readily determine that this explanation is pretextual and that

---

[36] The plaintiff contends that the defendant's reliance upon Helfrich's
Assessment is *not* sufficient to withstand its burden to put forth a "clear and
specific" reason for selecting Schwarzkopf for termination.  Meiri v. Dacon, 759
F.2d 989, 996-997 (2d Cir. 1985) ("the burden of production frames the factual
issue with sufficient clarity to afford the employee a full and fair opportunity to
demonstrate pretext.  To this end, the employer's explanation of its reasons must
be clear and specific"), cert. denied, 474 U.S. 829 (1985).  See also, note 30 supra,
citing Medeiros, 272 Fed. Appx. at n.2.  Because Sikorsky's explanation here does
not meet this burden, summary judgment must be reversed.  See, Furnco
Construction Corp. v. Waters, 438 U.S. 567, 577 (1978).

-42-

the plaintiff's disability was at least a motivating factor in Sikorsky's decision to select him for termination.

The mere fact that a RIF is necessary or appropriate for business reasons does not insulate an employer from liability, and an employee is not required to demonstrate that the reduction as a whole was pretextual. Instead, the question in such a case is whether the selection of the plaintiff as one of the individuals to be terminated was motivated by discrimination. Cronin v. Aetna Life Insurance Co., 46 F.3d 196, 204 (2d Cir. 1995). As will be discussed below, there is ample evidence in the record from which a jury could reasonably conclude that the plaintiff was terminated because of his disability.

The District Court separately considered just four evidentiary bases from which the plaintiff had argued that a jury could find pretext, namely (1) that the defendant had not eliminated his position, but rather had replaced him in the Gear Room with a non-disabled supervisor, Redka; (2) that Helfrich's Assessment of the plaintiff was not consistent with the earlier assessments by Driscoll in which other L6 Supervisors received lower overall scores; (3) that Helfrich failed to even articulate a justification for the low rating he assigned to Schwarzkopf in the Interpersonal Skills Factor; and (4) that Helfrich's written notes reveal that he had, at least in some respects, predetermined which employees would be rated lowest

-43-

and thereby be at risk for termination.  (JA 675-676)  But by concluding that the plaintiff's position was eliminated and that he was not "replaced" by the non-disabled Redka (JA 675-676), notwithstanding evidence that Redka began "filling in" for the plaintiff months before the RIF was completed,[37] and by finding that there was not sufficient evidence of "'pre-assessment' determinations," even in light of Helfrich's written notes (JA 676),[38] the District Court erroneously substituted its own judgment for the jury's.

Additionally, in stark contrast to the required holistic approach to review the evidence in its totality, the District Court reviewed individual pieces of evidence

---

[37] A jury could find Sikorsky's claim that it eliminated the plaintiff's position to be false.  Before Schwarzkopf went out on medical leave, there were five Gear Room Supervisors (including plaintiff).  In early-October – before he was told about the RIF and before he was actually laid off, a sixth Gear Room Supervisor – Redka, was added and took over all of Schwarzkopf's duties.  Redka and the plaintiff are even listed together on the defendant's Gear Room organizational chart document from mid-October 2010.  Consequently, a jury could conclude that there was a zero sum gain between the plaintiff's termination and the addition of the newly hired, non-disabled, Redka into the Gear Room.

[38] Judge Covello also erred in finding that "Helfrich's notes fail to *clearly* indicate such an intention..." (JA 676, emphasis added) because in so doing he failed to draw all reasonable inferences in the plaintiff's favor as is required at summary judgment.  Holcomb, 521 F.3d at 137.  A reasonable jury could readily infer, at least from Helfrich's reference to "Gears 4 Folks" above the *five* then existing Gear Room Supervisors, and from his noting "OK" under both Caracas' and Ortiz-Perez's names, that he had some pre-conceived notions or intentions as to who should be eliminated from and who should be retained in the Gear Room.

-44-

which the plaintiff argued were supportive of pretext, and dismissed the majority

of that evidence as "not sufficient."[39] (JA 676)  More particularly, Judge Covello

summarily, but separately, dismissed, as "not sufficient" or as "not provid[ing] a

basis for unlawful discrimination," the inconsistency between Helfrich's relative

ratings as compared to those Driscoll had assigned in earlier assessments;[40] as well

as Helfrich's failure to articulate any reason for assigning Schwarzkopf the lowest

---

[39] It is error for the court to find, "in isolation from all of [the] evidence of pretext," that a single strand of evidence, which it concludes does "not support a jury's finding of pretext," lacks "any probative value whatsoever." Medeiros, 272 Fed. Appx. at n.4. "The proper inquiry is whether the evidence has *any* probative value on the issue of whether the employer's reasons for [the plaintiff's] termination were credible." Id. (emphasis in original), citing Byrnie, 243 F.3d at 103-104.

[40] The Court did seem to recognize that this inconsistency could cast doubt upon the credibility of the defendant's explanation, but inexplicably Judge Covello nonetheless disregarded it, noting simply "this fact does is [sic] not sufficient to create an issue of fact for trial." (JA 676)

However, these prior assessments are insightful.  In the 2009 RIF Assessment just over a year prior, of the eight other L6 Supervisors who were also rated by Helfrich in the 2010 RIF Assessment, Driscoll rated only one (Caracas) higher than Schwarzkopf (and only by a single point).  Given that these two Assessments ranked these employees in the very same Factors, both on a prospective basis, one could certainly question the plaintiff falling from the top of the pack to the last spot.  Likewise, the 2010 salary planning Assessment, which Driscoll completed just a couple of months before Helfrich did his RIF Assessment – adds further doubt since there three of the L6 Supervisors whom Helfrich evaluated against the plaintiff – Keel-Romano, Ortiz-Perez and Redka – each received significantly lower overall scores from Driscoll (14, 10 and 5, respectively) than did Schwarzkopf (15).

ranking in "Interpersonal Skills;"[41] and also the fact that Helfrich's written notes reveal that he had, at least in some respects, predetermined which employees would be rated lowest and thereby be at risk for termination. (JA 676)  This weighing of individual strands of evidence in isolation flies in the face of the applicable sufficiency of evidence standard.

But as detailed herein, the record is replete with additional evidence that is probative of pretext and which must be considered when ruling on a motion for summary judgment.  First, Helfrich conducted his Assessment of the plaintiff and the ten other L6 Supervisors just *days* after he became General Manager of the group and when he admittedly did not know any of the employees whom he was comparing.  From this, a reasonable jury could question the credibility of his scores and the relative rankings, especially in light of the highly subjective quality of the Assessment as a whole[42] and Helfrich's failure to consider objective,

---

[41] While the Court singled out this one Factor, the plaintiff argued that the record evidence related to the other four Factors, including Helfrich's alleged justifications for the scores and the ratings he assigned in each, is also probative of pretext.  See e.g., Medeiros, 272 Fed. Appx. at 81 (noting the district court's "improper exclu[sion of] other evidence from its consideration of the 'aggregate evidence of pretext in the record.")

[42] This Court has cautioned that "an employer may not use wholly subjective and unarticulated standards to judge employee performance."  Byrnie, 243 F.3d at 105 (in the context of promotions).  See also, Tomasso v. Boeing Company, 445 F.3d 702, 706 (3rd Cir. 2006) ("low evaluation scores may be a pretext for

-46-

available quantitative metrics such as lead time reduction and cost of poor quality.[43]  It is also notable that the subjectivity of Helfrich's Assessment could have been minimized if the defendant had simply adhered to its own "tiered-approach" to the Assessment process.  But since Casasanta admits that she did not conduct any independent assessment and there is no admissible evidence that she even "reviewed" Helfrich's Assessment, the jury would be free to consider that the plaintiff was denied the security that might have come with the progressively higher level of review that was supposed to have been part of this process.[44]

---

discrimination, especially where, as here, an employer uses subjective criteria such as 'attitude' and 'teamwork' to rate its employees"); Green v. New Mexico, 420 F.3d 1189, 1195 (10th Cir. 2005) ("subjective criteria may provide evidence of pretext when it is used to evaluate candidates that are not objectively equally qualified...we typically infer pretext...when the criteria on which the employers ultimately rely are entirely subjective in nature") (Internal citations and quotations omitted).

[43] This is especially suspect given Helfrich's testimony that performance with respect to lead time reduction and cost of poor quality was precisely what was being assessed in the "Achieves Results" Factor.  That Schwarzkopf received the lowest score assigned to any of the L6 Supervisors in this Factor only heightens that suspicion.

[44] Such a failure by an employer to follow its own policies or routine procedures can be considered as evidence of pretext.  Weiss, 332 Fed. Appx. at 664.  See also, Windham, 275 F.3d at 190; Stern, 131 F.3d at 313-314 (internal citation omitted).

A reasonable fact finder could further find that the relative scores Helfrich assigned were incompatible with Schwarzkopf's demonstrated record of success and capabilities. For example, the plaintiff's recent achievement in becoming the only ACE Associate certified Gear Room Supervisor was something that clearly set him apart from the others whom he was assessed against and by the defendant's own words "demonstrated his ongoing commitment to contribute to the company's Operations Transformation." Helfrich was specifically asked to assess, on a prospective basis, how employees "apply strengths to achieve meaningful results" (in Achieves Results), to evaluate "how critical or unique [ ], or broad or versatile [ ] are the employee's skills" (in Criticality of Skills), and to consider how the employee's "qualifications. . . compare with others" (in Qualifications). Although he denied that ACE certification was relevant in his Assessment, a jury could infer that such certification at least *should* have been a consideration in light of the above definitions – and therefore that the low scores Helfrich assigned to the plaintiff in these Factors are dubious.

Similarly, a jury could easily infer that the plaintiff was *more supportive* of the Lean Manufacturing changes that were occurring in the Gear Room based upon the uncontested facts surrounding Schwarzkopf's successful and voluntary participation in the Gears 3P Event just a few months before the RIF. Not a single

other L6 Production Supervisor participated in this Event. Helfrich testified that he gave particular consideration to whether and how the L6 Production Supervisors supported the Lean Manufacturing changes that were being implemented when he scored the Achieves Results and Business Orientation Factors. Yet he rated the only supervisor who had demonstrated support for these changes – the plaintiff, lower than the supervisors about whom there is no such evidence and who instead the record reveals were openly hostile and dismissive of the company's efforts. From these facts, a jury could find that Schwarzkopf's support of the impending changes should have been reflected positively in his scores if this was an honest explanation for assessing these Factors.

A fact finder could also view the higher relative ratings that Helfrich assigned to employees he knew were brand new to Sikorsky[45] as additional evidence that serves to undermine the sincerity of Helfrich's Assessment, especially given his explanations about his scoring in certain Factors. For instance, Helfrich testified that he considered work experience and history, in particular the knowledge of and ability to run the machines in Sikorsky's Gear Shop, into account when he assigned Schwarzkopf a score of 3 (out of 5) in the

---

[45] That the defendant does not seem to have given any serious consideration to laying off either of the brand new employees rather than terminating an employee with a twenty year history may itself be considered evidence of pretext.

Qualifications Factor. But that explanation is completely belied by the fact that Helfrich assigned the very same score to both Ortiz-Perez and to Redka, despite their very limited history at Sikorsky and that he knew nothing about their particular skills or abilities, or their work in the Gear Room over their short tenure. The same is true for the Interpersonal Skills Factor, where Helfrich was supposed to assess the employees' relative ability to "work with others and leverage skills and talents to gets tasks accomplished," and where he rated both Ortiz-Perez (4) and Redka (3) (out of 5) much higher as compared to the plaintiff who received the lowest rating possible (1), notwithstanding that Helfrich had no basis from which to make reliable comparisons.

The contradiction between Helfrich's claimed rationalizations for the scores assigned to Schwarzkopf is even more apparent when one looks carefully at the Achieves Results Factor. Here, the plaintiff was rated lowest of all the L6 Supervisors, and Ortiz Perez was rated highest (with a score that was twice the plaintiff's (8, instead of 4, out of 10)) – in a category that Helfrich testified was about "applying strengths to achieve meaningful results with regard to changes in the Gear Room," even though he had never met Ortiz-Perez, did not receive any feedback from Driscoll or Ioppolo about him, and could not offer any justification

for the higher rating.  Under these circumstances a jury could easily doubt both the

accuracy and the honesty of Helfrich's relative ratings in the Assessment.[46]

Furthermore, since Helfrich was not able to articulate any basis whatsoever

for any of the ratings or the overall scores he gave to the anyone else besides

Schwarzkopf, the jury could easily conclude that Helfrich concocted post-hoc

rationalizations – but only for the plaintiff – in a transparent attempt to hide his

true motivation.[47]  As the First Circuit stated in Currier, "[t]he *prima face* case

and...the unpersuasive explanations for [the] low ratings loom large in the absence

of any other explanation."  393 F.3d at 254, citing Reeves, 530 U.S. at 147

(internal quotations omitted).

---

[46] Plaintiff is not suggesting that evidence regarding the disparity of qualifications and/or experience between Schwarzkopf on the one hand, and Ortiz-Perez or Redka on the other, is sufficient to defeat summary judgment.  But as this Court has cautioned in Byrnie, "just because the discrepancy between [the plaintiff's] and [the retained employees'] qualifications does not on its own have the strength to create a material issue of fact, that does not mean the discrepancy is stripped of all probative value."  243 F.3d at 103.

[47] Helfrich's general credibility is also undermined by his testimony that he did not know any information about the ages of the personnel in his group.  Since a jury could find that testimony to be false, based upon his contradictory notes, it could doubt Helfrich's testimony, in whole or in part, as to other subjects too.  See, United States v. Weinstein, 452 F.2d 704, 713-714 (2d Cir. 1971), citing Knowles v. People, 15 Mich. 408, 412 (1867) ("But when testimony is once before the jury, the weight and credibility of every portion of it is for them, and not for the court to determine.")

Lastly, here there is direct evidence of disability-based hostility.[48]  From the repeated references throughout Helfrich's notes about the medical conditions and illnesses of the three employees in his organization who were known to be disabled a jury could reasonably infer that Helfrich was fixated upon and/or targeting these employees.  Or a jury could view such notations as Helfrich openly exhibiting hostility toward his disabled employees.  This is even more likely given the evidence that Helfrich intentionally manipulated at least one score between a draft of his Assessment and the final version that Casasanta relied upon, which a jury could conclude was for the express purpose of ensuring that a disabled employee – Millar – would be the lowest ranked in her comparator group and thus the most vulnerable for termination.

---

[48] That the defendant has refused to rehire the plaintiff in the face of at least ten applications that Schwarzkopf has submitted – including, but not limited to, for the same position that was "eliminated" and for lower level positions for which he was obviously qualified – and even after Redka resigned – is additional evidence which a jury could consider as evidence of pretext.  Stratton, 132 F.3d at 880 (recognizing that a refusal to consider plaintiff for new positions for which he was qualified supports a finding of pretext).  See also, Leibowitz, 584 F.3d at 505.

V.    **The Cumulative Weight of the Evidence is Sufficient to Permit a Reasonable Jury to Conclude that Schwarzkopf's Disability was a Motivating Factor in the Defendant's Decision to Terminate His Employment**

When the record evidence is considered in its totality, rather than in the piecemeal fashion employed by the District Court, there is indeed sufficient evidence to conclude that the plaintiff's termination was motivated by disability discrimination. To summarize, based on the cumulative weight of the record considered as a whole, a reasonable jury could find both that (1) Schwarzkopf has presented a solid *prima facie* case of disability discrimination; and (2) that there is abundant evidence to support a finding that Helfrich's Assessment, which led to his termination, was a pretext for disability discrimination.

Based upon the results of Helfrich's 2010 RIF Assessment, Schwarzkopf plainly offered facts showing that Helfrich was fixated upon the fact that certain of his employees, including the plaintiff, were disabled; that in doing his Assessment, he treated those employees far less favorably than the non-disabled employees in his group; and that the plaintiff's position in the Gear Room was not eliminated, but he was instead replaced by the non-disabled Redka. A reasonable jury could determine, based upon any single piece of this evidence, and certainly in the aggregate, that Schwarzkopf's termination occurred under circumstances giving rise to an inference of disability discrimination.

-53-

In addition, a careful review of Helfrich's Assessment makes it obvious that a jury could conclude that disability played at least some role in Helfrich's ratings and therefore in Schwarzkopf's termination.  Helfrich was the General Manager of the group for a matter of days when he conducted this highly subjective review of his workforce, and did so without the benefit of any of the objective, quantitative metrics that were readily available to him.  Despite that fact, the defendant wholly failed to put Helfrich's Assessment through the tiered review that was supposed to occur.  Additionally, Sikorsky has refused to rehire the plaintiff despite receiving no less than ten re-applications from him since his termination.

The relative scores assigned by Helfrich, in and of themselves cast further doubt upon the credibility of the Assessment.  Schwarzkopf's low scores were totally at odds with his record of demonstrated success at Sikorsky, including as evidenced by his ACE achievement and his successful participation in the recent Gears 3P Event – two facts which should have set him apart from, and above, his L6 Production Supervisor peers.  Likewise, the higher relative ratings that Helfrich assigned to two brand new employees – Redka and Ortiz-Perez  – further undermines the legitimacy of Helfrich's Assessment, especially in light of Helfrich's vague and even contradictory explanations as to what he considered in assigning scores.  Tellingly, Helfrich's inability to articulate any justification for

-54-

any rating he assigned to even a single other employee only makes his explanations for each of the plaintiff's low ratings even more suspect as mere post hoc rationalizations. Indeed, the blatant inconsistency between Helfrich's 2010 Assessment and the two earlier assessments completed by Driscoll, wherein Driscoll rated *several* other L6 Production Supervisors *lower* than the plaintiff in the very same Factors, certainly casts substantial doubt upon this Assessment and the plaintiff's resultant termination.

In addition, there is also direct evidence of disability-based hostility. First, Helfrich's own notes reveal a fixation upon the disabled employees in his group and suggest that he targeted them. The notes further undercut Helfrich's veracity in general and suggest a personal animus toward disabled employees – most specifically, through his inclusion of numerous references to facts related to certain employees' disabilities, and through his intentional alteration of scores so as to ensure that it was a disabled employee who was at risk of termination in the L5 Manager group. One could also infer from the various notations that Helfrich had predetermined, at least to some extent, how certain employees would fair in the Assessment, especially in the Gear Room.

There is no question that based on the totality of this evidence, including the solid *prima facie* case and the many facts probative of pretext discussed above,

that a reasonable jury could determine that disability was a motivating factor in

Helfrich's Assessment and in Sikorsky's resultant decision to terminate

Schwarzkopf.  As this Court noted in a very recent employment case,

> A jury might credit all of this proffered evidence, some of it, or none at all.
> But that is 'left for the jury to decide at trial.'  And if at least some of this
> evidence is believed by a jury, that jury could also conclude that, despite
> [any negative views of the plaintiff], his firing was 'more likely than not
> based in whole or in part on discrimination...'

Kirkland v. Cablevision Sys., __ F.3d __, 2014 U.S. App. LEXIS 14223 at *11 (2d

Cir. 2014) (per curiam).

## CONCLUSION

For all of the foregoing reasons, the District Court's ruling granting

summary judgment as to the plaintiff's disability discrimination claims should be

vacated and the case remanded for trial on such claims.

Respectfully submitted,

Nicole M. Rothgeb
Gregg D. Adler
Livingston, Adler, Pulda, Meiklejohn
  & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
Phone:  (860) 233-9821
Fax: (860) 232-7818
nmrothgeb@lapm.org
October 10, 2014                    gdadler@lapm.org

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)(B) and (C)

Nicole M. Rothgeb and Gregg D. Adler, attorneys for Plaintiff-Appellant,

Philip Medeiros, hereby certify that the within and foregoing Brief for Plaintiff-

Appellant contains 13,977 words (such number having been determined by the

Corel WordPerfect X6 word-processing system used to prepare the Brief) using a

14-point Times New Roman font, and as such is in compliance with Federal Rule

of Appellate Procedure 32(a)(7)(B) and (C).


_____

Nicole M. Rothgeb

# SPECIAL APPENDIX
## TABLE OF CONTENTS

**DOCUMENT**                                            **PAGE NO.**

Ruling on Defendant's Motion for Summary
    Judgment, filed 6/24/14........**Special Appendix 001**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

JOHN SCHWARTZKOPF, JR.,      :
  plaintiff,             :
                          :
     v.                 :   Civil No. 3:13CV00087(AVC)
                          :
SIKORSKY AIRCRAFT CORP.,     :
  defendant.           :

**<u>Ruling on the Defendant's Motion for Summary Judgment</u>**

This is an employment discrimination action in which the plaintiff, John Schwartzkopf, Jr., alleges that the defendant, Sikorsky Aircraft Corporation (hereinafter "Sikorsky"), unlawfully terminated his employment based upon his age and alleged disability in violation of the Age Discrimination in Employment Act (hereinafter "ADEA") 29 U.S.C. § 621, et seq., the American's with Disabilities Act (hereinafter "ADA"), 42 U.S.C. § 12101, et seq., and the Connecticut Fair Employment Practices Act (hereinafter "CFEPA"), Conn. Gen. Stat. § 46a-60, et seq.  The defendant has filed a motion for summary judgment. For the reasons that follow, the motion is granted.

**<u>FACTS</u>**

An examination of the complaint, pleadings, local rule 56 statements, exhibits accompanying the motions for summary judgment and responses thereto, discloses the following undisputed facts:

**SPECIAL APPENDIX 001**

The defendant, Sikorsky Aircraft Corp. ("Sikorsky"), designs, manufactures and services helicopters for commercial, industrial and military use. Sikorsky maintains policies prohibiting employment discrimination. In March 2003, Sikorsky re-hired Schwarzkopf as a gear generator-operator in the precision components group of its product centers organization.[1] At the time, he was 44 years old. In November 2005, he became a supervisor in the gear room, a salaried position at Sikorsky.

In his 2008 performance evaluation, Schwartzkopf received a rating of "fully competent." His evaluation, signed in 2010 by the plaintiff's then supervisor Peter Eisenman, stated that Schwarzkopf "is a hardworking and dedicated supervisor," but "he can be a little stubborn and defensive when it comes to constructive criticism." The evaluation also noted that he "needs to be more supportive of ACE[2] personally; this will help to improve the participation of his people in ACE activities."

With respect to a 2009 reduction in force ("RIF"), Schwartzkopf's then general manager, David Driscoll, rated him approximately in the middle[3] of the 96 salaried employees.

---

[1] Schwarzkopf worked for Sikorsky on several previous occasions as a nonexempt, hourly employee.

[2] "ACE" stands for Achieving Competitive Excellence, and "is a proprietary operating system designed by United Technologies Corporation to ensure world-class quality in its products and processes."

[3] "Driscoll rated [p]laintiff a total score of 27, with 41 salaried employees in Precision Components receiving higher scores, 43 receiving lower scores, and 11 receiving the same score."

2

Schwartzkopf received a score of "P" for "progressing" on his 2009 performance evaluation, which was completed on February 15, 2010.[4] The evaluation stated that Schwartzkopf "needs to take more ownership of meeting customer commitments," that "[s]afety metrics in the gear room did not meet our goals" and that "ACE Silver has been a disappointment in the gear room."

In April or May 2010, Driscoll assessed and ranked the salaried employees in Schwartzkopf's group for an annual salary adjustment process. The assessment considered "five categories: Achieves Results, Criticality of Skills, Qualifications, Business Orientation, and Interpersonal Skills." As part of the assessment, Nick Ioppolo and Steve Pawlowicz, Driscoll's operations managers, assessed employees who reported to them and Driscoll then reviewed their assessments. On the assessment, Schwartzkopf "received a total score of 15, including 5 out of 10 for Achieves Results, 5 out of 10 for Criticality of Skills, 2 out of 5 for Qualifications, 1 out of 5 for Business Orientation, and 2 out of 5 for interpersonal Skills." Out of the 54 salaried employees assessed in Precision Components, four scored worse than Schwartzkopf. Two of these four were new

---

[4] This rating is the third out of four and is just above "U" for "unsatisfactory performance." "A '[p]rogressing' rating may apply to employees new to a position who need more time and training to become competent in their positions." It is defined as "performance is developing/improving, application of the competencies is somewhat evident; continued improvement and development are necessary."

3

**SPECIAL APPENDIX 003**

employees.  The assessment was "retrospective, evaluating each employee based on his or her prior performance."

On August 1, 2010, Robert Helfrich took the place of Driscoll as the general manager of the Precision Components division.  "Helfrich had previously served as General Manager of Sikorsky's Blade Product Center."  Helfrich "began to gather information about the group and its employees."

In early August meetings, Driscoll told Helfrich about "challenges of the Precision Components business, the plans that were underway, and his view of the group."  He also "told Helfrich that the gear room supervisors . . . were not particularly strong, and not as strong as the business required."  Driscoll identified three of them by name; Norko, Savino and Schwartzkopf.  Driscoll "told Helfrich that [the] [p]laintiff was an impediment who was not supportive of his manager and of the direction they were trying to move the gear business."  He also "told Helfrich about an incident in which Ioppolo, the department manager for the gear business, had to pull [the] [p]laintiff out of a meeting because [the] [p]laintiff was challenging the direction in which Ioppolo was moving the organization."  "Driscoll told Helfrich that the gear business was lagging in its ACE achievement levels," and that it was Driscoll's belief that Schwartzkopf was "falling short" with respect to the expectation that he be an active and visible ACE

4

leader in his department.   The plaintiff points out that
Driscoll also stated that the other gear room supervisors were
also not meeting expectations.   Although Schwartzkopf achieved
ACE associate certification, Helfrich states that he was not
aware of this fact.   Driscoll stated to Helfrich that
Schwartzkopf "resisted changes in the gear shop, including
resisting a movement to reduce lot sizes and increase flow
velocity through the shop."   Driscoll told Helfrich he did not
believe Schwartzkopf was qualified to run the department.

Also in early August 2010, Helfrich met with the two
operations managers, Ioppolo and Pawlowicz, in order to collect
additional information about their organizations.   Ioppolo was
responsible for the gear room.   He told Helfrich that
Schwartzkopf "was not supporting changes in the gear room" which
Helfrich understood to include "restructuring of the machines to
create a cellular structure" and "chang[ing] the way the gear
shop was run with regard to batch sizes."

"In mid-2010, Sikorsky decided that, in light of its
business needs, the present business climate, and the future
business outlook, it needed to restructure parts of its business
and reduce its workforce."   In August, the defendant began the
process of deciding which employees would be laid off as part of
a reduction in force ("RIF").   The objective of the Employee
Assessment Guidelines for the 2010 RIF, was "to assist

5

Sikorsky's management in identifying the strongest and weakest
contributors in the workforce, taking account of the skills and
competencies that promote the Company's business goals."

After receiving an email concerning the planned RIF from
human resources, Helfrich attended a training session with
respect to the lay-off. He continued review of the precision
components group and communicated with his direct reports,
Ioppolo, Pawlowicz, Jim Villano, Dean Berke, Sue Spence, Brian
Moffett and Tony Lawrence, about their respective organizations
and the employees who reported to them. He had conversations
"about how people were performing and the dynamics of the
business." Helfrich "obtained and reviewed a copy of the salary
planning assessments and ranking of the employees in his group
that Driscoll completed" in April or May 2010. As part of the
planned RIF, Helfrich "as General Manager of Precision
Components, . . . assessed all of the approximately 50 salaried
employees in the group, of which the gear room supervisors-
including [the] [p]laintiff-were a part."

With respect to the 2010 RIF, "Helfrich assessed each
employee relative to the other employees in the same job
classification, labor grade, and role." Therefore, he assessed
Schwartzkopf "relative to the 10 other supervisors of hourly
employees with production responsibility in Precision Components
with a labor grade of L6." According to Sikorsky's guidelines

6

and training materials regarding the 2010 RF, the assessments
were to be "based upon prospective considerations" and "assess
[the employee's] ability to perform under current and future
business conditions." The assessment addressed the same five
criteria that were assessed in the 2010 salary planning
assessment.

"Helfrich rated [the] [p]plaintiff a total score of 16,
including 4 out of 10 for Achieves Results, 6 out of 10 for
Criticality of Skills, 3 out of 5 for Qualifications, 2 out of 5
for Business Orientation, and 1 out of 5 for Interpersonal
Skills." He ranked last of the 11 supervisors with production
responsibility, with whom he was compared. With respect to
"Achieves Results," Helfrich stated that he gave Schwartzkopf a
4 out of 10 "because he was not applying his strengths to
achieve meaningful results with regard to the changes that were
being driven in the gear room." With respect to "Criticality of
Skills," Helfrich stated that he ranked Schwartzkopf 6 out of 10
"based on the uniqueness or lack of uniqueness of the position
he was in." With respect to "Qualifications," Helfrich stated
that he ranked Schwartzkopf 3 out of 5 because of "his
experience in the gear shop and his 'knowledge[] of elements of
the gear manufacturing.'" With respect to "Business
Orientation," Helfrich stated that he ranked Schwartzkopf 2 out
of 5 because "he was not embracing and helping support changes

7

in the business." Helfrich could not recall his basis for rating Schwartzkopf 1 out of 5 for "Interpersonal Skills."

After the assessment process, the human resources department determined employee rankings in each unit. "[T]he ultimate decision concerning which Product Centers employees would be selected for layoff was made by Vice President for Product Centers Sherlyn Casasanta, based on the assessments of Helfrich and others." As part of the 2010 RIF, Sikorsky selected 222 salaried employees to be laid-off, "including [the] [p]laintiff and 10 other Product Centers salaried employees." On September 30, 2010, Sikorsky notified most employees selected for lay off in person. On October 15, 2010, Helfrich informed Schwartzkopf by phone. The defendant states that Schwartzkopf was informed later than other employees because he was on temporary medical leave of absence. The plaintiff states that he is not aware of the reason for the delay in notifying him. On December 1, 2010, Schwartzkopf's doctor cleared him to return to work and, therefore, his layoff was effective on that day.

During his employment at Sikorsky, Schwartzkopf never met Helfrich. Helfrich completed his assessments in connection with the 2010 RIF approximately three weeks after becoming general manager of precision components. During that time, Schwartzkopf was on temporary medical leave of absence.

8

**SPECIAL APPENDIX 008**

Schwartzkopf knew Casasanta "'[a] little bit' and would 'say hello to her,' but he 'never [had] a conversation' with her." Casasanta testified that she could not recall ever meeting Schwartzkopf.

Schwartzkopf "was the fourth oldest (i.e., the third youngest) of the six gear room supervisors." He was younger than Norko, by four years, Frank Savino, by seven months and Carlos Caracas, by nineteen days.

At the time of the RIF, Helfrich and Casasanta were not aware of Schwartzkopf's particular diagnosis of "degenerative foraminal stenosis and cervical disc rupture" and the particular limitation it created on his "walking, standing, lifting and twisting." Helfrich was aware that Schwartzkopf was on medical leave of absence in August 2010. Casasanta was not aware of this fact.

"Of the 11 supervisors of hourly employees with production responsibility in the Precision Components group with a labor grade of L6 whom Helfrich assessed . . . [the] [p]laintiff was the only one who was laid off, while Redka was among the 10 whom Sikorsky retained." Schwartzkopf's duties were assigned to Redka. Schwartzkopf testified that he "did not know [Redka's] health by any means."

While Helfrich was three years younger than Schwartzkopf, Casasanta was three years older.

9

All of the gear room supervisors who were older than Schwartzkopf "were rated higher than [the] [p]laintiff and retained in the RIF."

## STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" Am. Int'l Group, Inc. v. London Am. Int'l Corp., 644 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce and Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all

**SPECIAL APPENDIX 010**

inferences and ambiguities in a light most favorable to the
nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d
Cir. 1991), cert. denied, 502 U.S. 849 (1991).  "Only when
reasonable minds could not differ as to the import of the
evidence is summary judgment proper."  Id.

**Discussion**

The plaintiff asserts claims of age and disability
discrimination under the ADEA, ADA and CFEPA. On a motion for
summary judgment, all of these claims are subject to the
McDonnell-Douglas three-part burden-shifting standard where the
plaintiff must establish a prima facie case of discrimination or
retaliation and then provide evidence to support a finding that
the real reason for termination was motivated by discrimination
and that the proffered reason was a pretext for such
discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792
(1973).

**I. Prima Facie Case**

**A. Age Discrimination Claims (ADEA and CFEPA)**

The ADEA makes it "unlawful for an employer . . . to
discharge any individual or otherwise discriminate against any
individual . . . because of such individual's age." 29 U.S.C.  §
623(a)(1).  The protected class is limited to persons 40 years
of age or older. See id. at §631.  Schwartzkopf offers no direct

11

evidence of discriminatory treatment based on age and both his ADEA and CFEPA claims are reviewed under the familiar McDonnell-Douglas framework, starting with the prima facie case. See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 n.1 (2d Cir. 2005).[5]

First, the plaintiff must establish a prima facie age discrimination case by demonstrating that: "(i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under conditions giving rise to an inference of discrimination . . . ." Id. (internal quotation marks omitted) (citations omitted). The plaintiff's prima facie burden at this stage is de minimis. Id.

Sikorsky argues that the supervisors responsible for Schwartzkopf's termination, Helfrich and Casasanta, were not aware of his age. Sikorsky also states that even though a younger supervisor, Vitaliy Redka, was retained in the gear room and took over Schwartzkopf's responsibilities, Redka did not "replace" him and, therefore, this fact does not create an inference of discrimination. Even if Redka did replace Schwartzkopf, Sikorsky argues that because Helfrich and

---

[5] Claims brought pursuant to the CFEPA are also analyzed pursuant to this burden-shifting framework. See Craine v. Trinity Coll., 259 Conn. 625, 636-37 (2002).

12

**SPECIAL APPENDIX 012**

Casasanta were unaware of the plaintiff's age, this replacement
fails to create a sufficient inference of discrimination.

Schwartzkopf responds that Helfrich was aware of his age
because he had access to records and knowledge of Schwartzkopf's
nearly thirty year career at Sikorsky.  Schwartzkopf also states
that the fact that he was replaced by a younger employee is
sufficient to raise circumstances giving rise to an inference of
discrimination.

Sikorsky replies that the plaintiff has failed to present
any evidence that Helfrich or Casasanta were aware of the
plaintiff's age.  With respect to Helfrich, Sikorsky states that
he never met Schwartzkopf, did not make any notes about his age
in the assessment and did not know when Sikorsky first hired
him.  With respect to Redka taking over Schwartzkopf's duties,
Sikorsky states that he did not "replace" the plaintiff and that
neither Helfrich nor Casasanta knew Redka's age.

The parties do not dispute that the first three prongs of
the prima facie case are satisfied. The analysis thus turns on
whether the plaintiff presents sufficient evidence to support an
inference of discrimination with respect to the fourth prong.
The court concludes that the evidence does create such an
inference.

"[T]he 'far more reliable indicator of age discrimination'
is the age discrepancy between the discharged employee and her

13

**SPECIAL APPENDIX 013**

replacement." Woodman v. WWOR-TV, Inc., 411 F. 3d 69, 78 (2d
Cir. 2005) (quoting O'Connor v. Consolidated Coin Caterers
Corp., 517 U.S. 308, 312 (1996)). "Thus, it is that discrepancy
as to which an employer must have some knowledge to support an
inference of discriminatory intent." Id.

Although there is some question as to Sikorsky supervisors'
knowledge of the discrepancy between Schwartzkopf and Redka's
ages and whether Redka in fact "replaced" Schwartzkopf, the
court concludes that the evidence is sufficient, at this prima
facie stage, to give rise to an inference of age discrimination.
When conducting his assessment of the plaintiff, Helfrich had
access to the plaintiff's employment records and history and,
therefore, it is reasonable to infer some knowledge with respect
to Schwartzkopf's age.  In addition, the supervisor who took
over Schwartzkopf's responsibilities was younger than him and
not in the protected class.  The plaintiff has presented
sufficient evidence with respect to his ADEA cause of action to
satisfy this prima facie stage of the case.

### B. Disability Claim (ADA)

Sikorsky argues that Helfrich and Casasanta were not aware
of Swartzkopf's alleged disability nor weather Redka, the
employee who took over the plaintiff's responsibilities, had any
qualifying disability.

14

**SPECIAL APPENDIX 014**

Schwartzkopf responds that Helfrich knew that he was out on medical leave and that Helfrich's own notes with respect to Schwartzkopf state "medical," "long-term disability," "out for month for neck injury," long-term illness" and "Schwartzkopf-cancer."

Sikorsky replies that the plaintiff has failed to present evidence that Helfrich or Casasanta knew about Schwartzkopf's alleged disability.

In order to establish a claim "under the ADA, the plaintiff must show that: '(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Adams v. Festival Fun Parks, LLC, 2014 WL 1099215 (2d Cir. 2014) (quoting McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013)). "Disability claims under the CFEPA are analyzed using a similar framework." Id.

The issue here is whether the plaintiff presents sufficient facts that he "suffered adverse employment action because of his disability." Id. The court concludes that the plaintiff has alleged sufficient facts, at the prima facie stage of the case, to support his claim. Helfrich's notes indicate some knowledge of the fact that Schwartzkopf was suffering from a condition

15

that rendered him unable to work.  This fact, coupled with the temporal quality of his termination, in relation to his medical leave of absence, are sufficient to support a prima facie case of disability discrimination.

## II. **Pretext**

Sikorsky next argues that it terminated Schwartzkopf for the legitimate nondiscriminatory reason that business needs and climate and the future of the company necessitated a reduction in its workforce.  The defendant states that it did not base his termination on unlawful discrimination and that the plaintiff has failed to present sufficient evidence that Sikorsky's legitimate nondiscriminatory reason was false or that discrimination was the real reason.  Specifically, Sikorsky argues that there is no evidence that either Helfrich or Casasanta had a discriminatory attitude and three of the gear room supervisors who were older than the plaintiff were retained.  Sikorsky states that even if Redka, who was younger than Schwartzkopf, replaced him, this fact alone is not sufficient to support a finding of pretext.  According to Sikorsky, their conduct during the 2010 RIF "was fully consistent with the conduct of non-discriminatory business affairs."  Viola v. Philips Medical Systems of North America, 42 F.3d 712, 717 (2d Cir. 1994).

16

Schwartzkopf responds that Sikorsky's proffered reason for termination was false and that the real reason was motivated by discrimination. Specifically, he argues that Helfrich's scores were inconsistent with Driscoll's previous scores regarding the salary assessment and were inconsistent with Schwartzkopf's actual performance. Schwartzkopf cites his participation in company enrichment programs like ACE. He states that Helfrich failed to articulate a basis for scoring the plaintiff 1 out of 5 with respect to "Interpersonal Skills" and his notes indicate that Helfrich made decisions regarding a particular employee's performance before he actually conducted his assessments.[6] Although Sikorsky stated that the plaintiff's position of gear room supervisor was being eliminated, Schwartzkopf notes that the defendant proceeded to give his responsibilities to Redka, a younger, non-disabled employee. Schwartzkopf states that since his lay-off, he has reapplied several times for the same or lesser positions and Sikorsky has not offered him a position. Schwartzkopf cites Medieros v. Pratt & Whitney Power Systems, 272 Fed. Appx. 78 (2d Cir. 2008), and Currier v. United Technologies Corporation, 393 F.3d 246 (1st Cir. 2004) for their holdings that the plaintiffs' in those cases, had presented sufficient evidence of pretext.

---

[6] Schwartzkopf also states that Helfrich's notes indicate that he changed an employee's score in an effort to rank another employee, who was disabled, lower and make the disabled employee more likely to be laid off.

17

The defendant replies that there is no inference of age discrimination here where the person involved in terminating the plaintiff was also in the protected class.  Sikorsky states that "[t]he complete absence of evidence of age -or disability- based discrimination warrants summary judgment regardless of whether [the] [p]laintiff can show pretext."  Sikorsky states that in the gear room, where Schwartzkopf was a supervisor, there were 11 supervisors prior to the RIF and 10 such positions afterward. Therefore, according to Sikorsky, the plaintiff's position was eliminated and Redka did not "replace" him.  The defendant cites the fact that of those supervisors, three who were retained after the RIF were older than Schwartzkopf.  Sikorsky also replies that although Casasanta stated that she never conducted an independent evaluation, she did not stat that she never "reviewed" Helfrich's assessments.  With respect to Helfrich's notes and the argument that he made decisions about certain employees before assessing them, Sikorsky states that the notes fail to indicate any such preliminary determinations.  Sikorsky states that Helfrich could not have known who would be laid off because Casasanta made that final decision and Helfrich reviewed Driscoll's salary planning assessment and talked to Driscoll and Ioppolo, among others, before making his final assessments. With respect to Schwartzkopf's ACE certification, the defendant states that Helfrich only considered whether an employee

18

demonstrated the ACE benefits and not simply whether they had
completed the ACE certification.  Sikorsky points out that there
is no evidence of any discriminatory remarks by Helfrich or
Casasanta and that the Medieros and Currier cases are readily
distinguishable.

The McDonnell-Douglas framework, requires that the final
burden-shift falls on the plaintiff to show that the defendant's
proffered non-discriminatory legitimate reasons for its adverse
employment actions were merely a pretext for discrimination.
St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). The
plaintiff must prove that the true reason for his termination
was unlawful discrimination.  Reeves v. Sanderson Plumbing
Products Inc., 530 U.S. 133, 148 (2000) (recognizing that the
plaintiff must show that the legitimate reasons offered by the
defendant were not its true reasons, but were a pretext for
discrimination.); Viola v. Philips Medical Systems of North
America, 42 F.3d 712, 717 (2d Cir. 1994).

The court concludes that the plaintiff has failed to
provide sufficient evidence of pretext and unlawful
discrimination to create a genuine issue for trial. With respect
to Schwartzkopf's argument that Sikorsky "replaced" him with a
younger employee in the gear room, where Schwartzkopf was a
supervisor, there were 11 supervisors prior to the RIF and 10
such positions afterward.  Therefore, and without any material

19

**SPECIAL APPENDIX 019**

facts to the contrary, it would appear that the position was in fact eliminated. In addition, of those supervisors who remained employed following the RIF, three of them were older than Schwartzkopf. Although Helfrich's scores of the plaintiff's performance were not entirely consistent with Driscoll's earlier scores, this fact does is not sufficient to create an issue of fact for trial. Helfrich considered Schwartzkopf's performance subsequent to Driscoll's analysis and did so in the context of a reduction in force after discussing the plaintiff's performance with other supervisors, including Driscoll. In addition, Helfrich's failure to articulate a reason for ranking Schwartzkopf 1 out of 5 with respect to his interpersonal skills does not provide a basis for unlawful employment discrimination. Helfrich states that he ranked the plaintiff based upon his assessment of his performance and discussions with Driscoll, Ioppolo and others. With respect to Helfrich's alleged pre-determination of employees to be laid off, the plaintiff has failed to present sufficient evidence of such pre-assessment determinations. Helfrich's notes fail to clearly indicate such an intention and, regardless, are not sufficient to raise a material issue of fact for trial. Therefore, the court concludes that the plaintiff has failed to carry his burden and the defendant's motion for summary judgment is granted.

20

**CONCLUSION**

For the foregoing reasons, the motion for summary judgment (**document no. 34**) granted.

It is so ordered this 24th day of June, 2014 at Hartford, Connecticut.

                /s /                 
                Alfred V. Covello
                United States District Judge

21